Certiorari Granted, No. 31,433, February 27, 2009

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMCA-022**

**Filing Date:   November 18, 2008**

**Docket No.  26,993**

**BEATRICE C. ROMERO, and**
**MICHAEL FERREE, on behalf of**
**themselves and all others similarly situated,**

**Plaintiffs-Appellants,**

**v.**

**PHILIP MORRIS INC.;**
**R.J. REYNOLDS TOBACCO CO.;**
**BROWN & WILLIAMSON TOBACCO CORP.;**
**LORILLARD TOBACCO CO.;**
**LIGGETT GROUP, INC.; and**
**BROOKE GROUP, LTD.,**

**Defendants-Appellees.**

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**James A. Hall, District Judge**

Youtz & Valdez, P.C.
Shane C. Youtz
Albuquerque, NM

Cuneo Gilbert & Laduca, L.L.P.
Daniel Cohen
Jonathan W. Cuneo
Washington, DC

Law Offices of Gordon Ball
Gordon Ball
Knoxville, TN

Cohen, Milstein, Hausfeld & Toll, P.L.L.C.

1

Megan Jones
Michael D. Hausfeld
Paul Gallagher
Washington, DC

for Appellants

Montgomery & Andrews, P.A.
Sarah M. Singleton
Andrew S. Montgomery
Kenneth Chernof
Santa Fe, NM

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Andrew G. Schultz
Albuquerque, NM

Wiggins, Williams & Wiggins, P.C.
Patricia G. Williams
Albuquerque, NM

Brownstein, Hyatt & Farber, P.C.
Eric R. Burris
Amy J. Diaz
Albuquerque, NM

Edwin L. Fountain
William V. O'Reilly
Thomas F. Cullen, Jr.
Washington, DC

Kirkland & Ellis, L.L.P.
Colin R. Kass
Washington, DC
Weil, Gotshal & Manges, L.L.P.
Irving Scher
New York, NY

Boies, Schiller & Flexner, L.L.P.
David Boies
Jack O. Stern
Amy J. Mauser
New York, NY

Kirkland & Ellis, L.L.P.
Stephen R. Patton
Andrew R. McGaan
Barack S. Echols
Chicago, IL

Weil, Gotshal & Manges, L.L.P.
Holly E. Loiseau
Cleveland Lawrence III
Peter D. Isakoff
Washington, DC

Arnold & Porter, L.L.P.
James F. Speyer
Los Angeles, CA

Kasowitz, Benson, Torres & Friedman, L.L.P.
Leonard A. Fiewus
Julie R. Fischer
New York, NY

for Appellees

**OPINION**

**ALARID, Judge.**

**{1}**     This is an appeal from the district court's grant of summary judgment in favor of Defendants on Plaintiffs' claim that Defendants engaged in an unlawful conspiracy to fix the prices of cigarettes sold in New Mexico.  We affirm the summary judgment in favor of Defendants Liggett and Lorillard; we reverse the summary judgment in favor of Defendants Philip Morris, Brown & Williamson, and R.J. Reynolds.

**BACKGROUND**

**{2}**     Plaintiffs-Appellants are a statewide class of retail customers who purchased cigarettes manufactured by Defendants during an approximately seven-year period commencing in 1993.  Defendants-Appellees are five leading domestic manufacturers of cigarettes:  Philip Morris, Incorporated (Philip Morris), R.J. Reynolds Tobacco Company (R.J. Reynolds), Brown & Williamson Tobacco Corporation (Brown & Williamson), Lorillard Tobacco Company (Lorillard), and Liggett Group, Incorporated (Liggett).

**{3}**     The American tobacco industry is a textbook example of an oligopoly: an industry in which production is concentrated in a handful of manufacturers.  *See generally Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 213-15 (1993); Walter

Adams & James W. Brock, *Tobacco: Predation and Persistent Market Power*, in *Market Dominance: How Firms Gain, Hold, or Lose It and the Impact on Economic Performance* 39 (David I. Rosenbaum ed. (1998)) (hereinafter *Market Dominance*). "[T]he cigarette industry is one of the most concentrated industries in the United States and has been so throughout the postwar [World War II] period." Walter Adams & James W. Brock, *The Structure of American Industry* 52 (11th ed. 2005) (hereinafter *Structure of American Industry*).

{4} There were two major outbreaks of price competition within the domestic tobacco industry during the 20th century. The first outbreak occurred during the Great Depression of the 1930s, with the introduction of cheaply priced "ten-cent brands." *Market Dominance* at 44. "To contain this outbreak of competition, the oligopoly responded with a lethal price-cost predation squeeze." *Id.* The industry's response was both effective in suppressing the competition from ten-cent brands—and illegal. The United States brought criminal charges against three of the major domestic cigarette manufacturers of the time, charging that the defendants restrained and monopolized the cigarette industry in violation of the Sherman Antitrust Act. *Id.* at 45. The three defendants were convicted by a jury, and the convictions ultimately were upheld by the Supreme Court. *Am. Tobacco Co. v. United States*, 328 U.S. 781 (1946).

{5} The second major outbreak of price competition occurred in 1980, when Liggett became the first major cigarette manufacturer to promote generic cigarettes. *Liggett Group, Inc. v. Brown & Williamson Tobacco Corp.*, 748 F. Supp. 344, 349 (M.D. N.C. 1990). At one time Liggett had been one of the larger manufacturers of branded cigarettes,[1] enjoying market shares of over 20 percent; however, by 1980, Liggett's market share had declined to slightly over 2 percent, and Liggett was on the verge of going out of business. *Id.* "Out of desperation" Liggett turned to a strategy of promoting generic cigarettes. *Id.* In contrast to branded cigarettes, which have distinctive packaging, are advertised heavily, and are sold at full price, *id.* n.8, Liggett's generic cigarettes were sold in plain packages mimicking the packaging of generic groceries, *id.* n.9. The principal competitive advantage of generic cigarettes was their lower price. *Brooke Group*, 509 U.S. at 214. Liggett's innovation was a success, and by 1984, generic cigarettes accounted for about 4 percent of domestic cigarettes, with Liggett's generic cigarettes accounting for 97 percent of the generic segment. *Liggett Group*, 748 F. Supp. at 349.

{6} Brown & Williamson, recognizing that it was losing a proportionally greater market share to Liggett than were other manufacturers, decided to wrest leadership of the generic segment from Liggett. *Brooke Group*, 509 U.S. at 214-15. Beginning in late May 1984 and continuing until the end of 1985, Liggett found itself embroiled in a fierce price war in the

---

[1]*Am. Tobacco*, 328 U.S. at 794-96 (setting out market data demonstrating that Liggett, along with American Tobacco Company and R.J. Reynolds, were the "Big Three" tobacco manufacturers during the 1930s).

4

wholesale cigarette market initiated by Brown & Williamson. *Liggett Group*, 748 F. Supp. at 349-50 (describing "rebate war" between Liggett and Brown & Williamson). In addition to vigorously competing in the marketplace, Liggett responded by suing Brown & Williamson in federal court, alleging, inter alia, that Brown & Williamson had engaged in unlawful predatory pricing by reducing the prices for its generic cigarettes below its average variable costs in order to pressure Liggett to raise its list prices for generic cigarettes. *Brooke Group*, 509 U.S. at 217. Liggett claimed that "[t]he resulting reduction in the list price gap . . . would restrain the growth of the economy segment and preserve Brown & Williamson's supracompetitive profits on its branded cigarettes." *Id.*

**{7}** After a lengthy trial, a jury found in Liggett's favor and awarded Liggett $49.6 million in actual damages, which the trial court trebled, resulting in an award of nearly $150 million. *Liggett Group*, 748 F. Supp. at 348. Brown & Williamson filed various post-trial motions, including a motion for judgment notwithstanding the verdict pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. *Id.* Liggett's case ultimately foundered due to key failures of proof. Liggett's expert had assumed that there was "an alignment of interest" among cigarette manufacturers in protecting the profits generated by premium cigarettes that would lead Brown & Williamson's competitors to join with Brown & Williamson in raising the prices of generic cigarettes so as to narrow the price gap between generic and premium cigarettes (thereby reducing the competitive advantage enjoyed by generic cigarettes and slowing the growth of the generic segment). *Id.* at 357. The trial court concluded that "[n]o substantial record evidence supports [Liggett's expert's] alignment of interest theory." *Id.* The trial court emphasized evidence establishing that very early in the development of generic cigarettes, R.J. Reynolds had entered and vigorously promoted the generic segment, that both R.J. Reynolds and Liggett had resisted Brown & Williamson's attempt to raise the prices of generic cigarettes, and that, by the time of trial, five of the six major manufacturers were selling some type of generic cigarettes. *Id.*

**{8}** The trial court entered judgment in Brown & Williamson's favor. *Id.* at 366. Liggett appealed. The Court of Appeals affirmed the trial court, *Liggett Group, Inc. v. Brown & Williamson Tobacco Corp.*, 964 F.2d 335 (4th Cir. 1992), and the United States Supreme Court affirmed the Court of Appeals, *Brooke Group*, 509 U.S. at 242. Overwhelmed by its rivals and denied protection under federal law, Liggett lost and never recovered leadership of the generic segment. *Market Dominance* at 48. During the period that the Liggett-Brown & Williamson predatory-pricing litigation was proceeding in the federal court system, the market share of generic and other discount cigarettes[2] continued to grow. The trend favoring

---

[2]Generic "black and white" cigarettes were supplemented by other varieties of discount cigarettes, including branded discount cigarettes such as R.J. Reynolds's "Doral," and "Value-25s" (a 25-cigarette pack sold at the same price of a conventional 20-cigarette pack). In the late 1980s, Liggett introduced subgeneric (or deep discount) cigarettes priced even lower than discount cigarettes. The industry often refers to discount and deep discount cigarettes as "value for money" or "VFM" products.

the discount segment cigarettes continued into the next decade, so that by 1993 discount and deep discount cigarettes had captured 40 percent of the United States cigarette market. *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1292 (11th Cir. 2003). However, rather than growing the overall market for cigarettes, the growth of the discount segment depended upon cannibalizing sales of premium cigarettes. *Brooke Group*, 509 U.S. at 214. Accordingly, the growth of the discount segment was "extremely undesirable from the perspective of premium-intensive manufacturers like [Philip Morris] and Lorillard." *Williamson Oil Co.*, 346 F.3d at 1292. In an internal document, Philip Morris estimated that each percentage point of market share claimed by the discount segment cost the cigarette industry $150 million *per month* in income. The industry faced what Philip Morris later described as a "cycle of despair":

> Ironically, each manufacturer worked independently to create a self-reinforcing "cycle of despair." . . . [M]anufacturers compensated for the income impact of weakening premium volumes and mix by raising premium prices. These funds were reinvested to grow the Discount category to replace the los[t] volume. In essence they were fueling the very situation they were trying to counteract.

**{9}**     In April 1992, Philip Morris attempted to lead an industry-wide increase in the prices of non-premium cigarettes in an effort to reduce the price advantage that non-premium cigarettes enjoyed over premium brands. *Williamson Oil Co.*, 346 F.3d at 1292. Philip Morris was forced to retract its price increases when R.J. Reynolds, Brown & Williamson, and Lorillard did not follow suit with parallel increases. *Id.* An attempt by Philip Morris to raise the price of deep discount cigarettes in March 1993 was similarly rebuffed by Philip Morris's rivals. *Id.*

**{10}**     Having failed to reduce the price gap between discount and premium cigarettes from the bottom up, Philip Morris settled on a dramatic alternative: reducing the price gap from the top down by cutting the retail price of its Marlboro premium brand—the best selling brand of cigarettes in the United States—by 40 cents per pack. *Id.* April 2, 1993, the day Philip Morris announced its price cut, came to be known as "Marlboro Friday." *Id.* Soon after, Brown & Williamson, R.J. Reynolds, and Lorillard matched Philip Morris's price reductions. *Id.* "[O]n July 20, 1993, [Philip Morris] announced that its Marlboro Friday price reduction would be made permanent and [would be] expanded to all of [Philip Morris's] premium brands, e.g., Parliament and Virginia Slims. *Williamson Oil Co.*, 346 F.3d at 1293. Philip Morris also "lowered the wholesale price of its discount cigarettes and raised the wholesale price of its deep discount brands by 10 cents per pack," thereby consolidating discount and deep discount cigarettes into a single price tier. *Id.* Philip Morris's rivals promptly followed Philip Morris's lead, consolidating their own discount and deep discount cigarettes into a single price tier. *Id.* Next, R.J. Reynolds announced that it was consolidating regular length and extra long premium cigarettes into a single price tier. *Id.* Philip Morris, Brown & Williamson, and Lorillard "quickly followed suit." *Id.* As a result of these maneuvers, a cigarette market that previously had included ten price tiers had

been reduced to two. *Id.*

**{11}** On November 8, 1993, R.J. Reynolds announced an increase of 4 cents per pack for both premium and discount cigarettes. By November 22, 1993, Philip Morris, Brown & Williamson, and Lorillard had matched the increases. *Id.* at 1294. These initial in-tandem increases in the prices of premium and discount cigarettes were followed by eleven more in-tandem increases in the prices of discount and premium cigarettes during the class period. *Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp.2d 1253, 1264 (N.D. Ga 2002). During the class period, the market shares of the premium-intensive manufacturers such as Philip Morris rose significantly; the market shares of R.J. Reynolds and Brown & Williamson, who had focused on developing the discount market segment, declined. *Williamson Oil Co.*, 346 F.3d at 1295.

## ANALYSIS

### Summary Judgment Standards

**{12}** Rule 1-056(C) NMRA, states that summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." An issue of fact is "genuine" if the evidence before the court considering a motion for summary judgment would allow a hypothetical fair-minded factfinder to return a verdict favorable to the non-movant on that particular issue of fact. *Goradia v. Hahn Co.*, 111 N.M. 779, 782, 810 P.2d 798, 801 (1991). An issue of fact is "material" if the existence (or non-existence) of the fact is of consequence under the substantive rules of law governing the parties' dispute. *See Farmington Police Officers Ass'n v. City of Farmington*, 2006-NMCA-077, ¶ 17, 139 N.M. 750, 137 P.3d 1204 (discussing materiality in the context of a dispute over the interpretation of a collective bargaining agreement).

**{13}** In urging us to affirm the district court, Defendants emphasize the fact that Plaintiffs' allegations of an industry-wide price-fixing conspiracy previously were the subject of an unsuccessful lawsuit brought in the United States District Court for the Northern District of Georgia in which the plaintiffs, wholesalers and distributors of cigarettes, sued Philip Morris, Brown & Williamson, R.J. Reynolds, and Lorillard, alleging that the defendants had engaged in price fixing in violation of the Sherman Antitrust Act. In that case, the trial court granted summary judgment in the defendants' favor on the plaintiffs' federal price-fixing claim, *Holiday Wholesale Grocery Co.*, 231 F. Supp.2d at 1253, and the Eleventh Circuit Court of Appeals affirmed, *Williamson Oil Co.*, 346 F.3d at 1291. Defendants point out that we have previously observed that "federal and our own state's constructions of summary judgment do not differ substantively." *Wolford v. Lasater*, 1999-NMCA-024, ¶ 11, 126 N.M. 614, 973 P.2d 866. Without formally invoking res judicata, Defendants invite us to rely on the reasoning of the Eleventh Circuit Court of Appeals. Plaintiffs, citing *Bartlett v. Mirabal*, 2000-NMCA-036, 128 N.M. 830, 999 P.2d 1062, argue that federal courts apply a less rigorous standard in granting summary judgment than do New Mexico courts and

argue that the district court erred by following the reasoning of the Eleventh Circuit Court of Appeals, which necessarily incorporated a less rigorous federal summary judgment standard.

**{14}** "Prior to 1986, the [United States] Supreme Court sent mixed messages about the availability of the [summary judgment] motion. Consequently, most commentators viewed [federal] courts during the 1938-1986 period as excessively reluctant to grant summary judgment." 11 James Wm. Moore, *Moore's Federal Practice* ¶ 56.03[1] (3d ed. 2007). There appears to be general agreement that within the federal court system the now well-known trio of Supreme Court summary judgment opinions, *Matsushita Elect. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), "substantially increased the availability of summary judgment and encouraged greater use of the motion by trial courts. In addition to establishing doctrine favoring greater use of summary judgment, each case gave strong rhetorical support to summary judgment as a means of case management and resolution." Moore et al., *supra*, ¶ 56.03[1]; *see also* 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2727 at 467-68 (1998).

**{15}** Rule 1-056(C) derives from the corresponding provision of the Federal Rules of Civil Procedure. NMSA 1953, § 21-1-1(56)(c), Compiler's Note (1954). Several reported New Mexico appellate decisions have cited *Anderson* or *Celotex*. *McElhannon v. Ford*, 2003-NMCA-091, ¶ 7, 134 N.M. 124, 73 P.3d 827 (applying *Celotex* in determining the sufficiency of the movant's prima facie showing in support of motion for summary judgment); *Bartlett*, 2000-NMCA-036, ¶¶ 41-45 (Alarid, J., specially concurring) (collecting cases). Our Supreme Court relied on *Matsushita* in upholding a grant of summary judgment in favor of an anti-trust defendant. *Clough v. Adventist Health Sys., Inc.*, 108 N.M. 801, 804, 780 P.2d 627, 630 (1989) (citing and quoting *Matsushita* for the proposition that "if [the alleged conspirators] had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy" (internal quotation marks omitted)). However, nothing in *Clough* suggests that the Supreme Court believed that it was departing from New Mexico's traditional summary judgment standards. We at one time expressed the opinion that "federal and our own state's constructions of summary judgment do not differ substantively," *Wolford*, 1999-NMCA-024, ¶ 11, but we subsequently undermined that generalization in *Bartlett* by expressly rejecting *Anderson*'s principal holding that a court in ruling on a defendant's motion for summary judgment must take into account the heightened burden of proof the plaintiff non-movant must satisfy at trial. *Bartlett*, 2000-NMCA-036, ¶ 39. Although New Mexico courts have continued to assume a general correspondence (except for the specific exception recognized in *Bartlett)* between federal and New Mexico summary judgment standards subsequent to *Matsushita*, *Anderson,* and *Celotex,* New Mexico appellate decisions have not relaxed the traditional stringent standard that a movant must meet in order to satisfy a New Mexico court that a dispute as to a material fact is not genuine, *e.g. Ocana v. American Furniture Co.*, 2004-NMSC-018, ¶ 22, 135 N.M. 539, 91 P.3d 58, and unlike

their federal counterparts, New Mexico courts continue to view summary judgment with disfavor, *compare Handmaker v. Henney*, 1999-NMSC-043, ¶ 21, 128 N.M. 328, 992 P.2d 879 (noting "the policy in New Mexico disfavoring summary judgment"), *with Armstrong v. City of Dallas*, 997 F.2d 62, 66 (5th Cir. 1993) (observing that "[t]he once frequently repeated characterization of summary judgment as a disfavored procedural shortcut no longer appertains" (footnote omitted)). Thus, notwithstanding the correspondence between the operative language of Rule 1-056(C) and Federal Rule 56(c), the ethos of New Mexico courts is less favorable to disposing of cases through summary judgment than that of federal courts in the period following *Matsushita*, *Anderson* and *Celotex*. Accordingly, we recognize that there may be cases where a New Mexico court will allow a case to go to trial on the same record on which a federal court would grant summary judgment.

**{16}** In reviewing a grant of summary judgment, "we step into the shoes of the district court, reviewing the motion, the supporting papers, and the non-movant's response as if we were ruling on the motion in the first instance." *Farmington Police Officers Ass'n*, 2006-NMCA-077, ¶ 13. This standard requires us to engage in our own independent review of the record, and we are not relieved of this responsibility merely because some other court has granted summary judgment, or upheld a grant of summary judgment, applying analogous substantive law to a similar record. Therefore, although we have read with considerable interest the decisions of the federal courts in *Holiday Wholesale Grocery Co.* and *Williamson Oil Co.*, our decision in this case represents this Court's de novo analysis of the record in this case.

**{17}** The principles we apply in conducting our de novo analysis are well settled. "We view the facts in a light most favorable to the party opposing summary judgment and draw all reasonable inferences in support of a trial on the merits." *Ocana*, 2004-NMSC-018, ¶ 12 (quoting *Rummel v. Lexington Ins. Co.*, 1997-NMSC-041, ¶ 18, 123 N.M. 752, 945 P.2d 970) (internal quotation marks and brackets omitted). "Judges should not make credibility determinations or weigh circumstantial evidence at the summary judgment stage." *Juneau v. Intel Corp.*, 2006-NMSC-002, ¶ 23, 139 N.M. 12, 127 P.3d 548.

**Applicable Principles of Antitrust Law**

**{18}** Section 1 of the New Mexico Antitrust Act (NMAA) provides as follows:

> Every contract, agreement, combination or conspiracy in restraint of trade or commerce, any part of which trade or commerce is within this state, is unlawful.

NMSA 1978, § 57-1-1 (1987). As our Supreme Court has observed, this language is patterned after Section 1 of the Sherman Antitrust Act. *Smith Machinery Corp. v. Hesston, Inc.*, 102 N.M 245, 249, 694 P.2d 501, 505 (1985). The close relationship between the NMAA and the Sherman Act is reinforced by Section 15 of the NMAA, which directs us to construe the NMAA "in harmony with judicial interpretations of the federal antitrust laws."

NMSA 1978, § 57-1-15 (1979). Accordingly, we draw upon federal case law interpreting Section 1 of the Sherman Act for substantive rules defining the scope of liability under NMAA Section 1.

**{19}** Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (2000). "[Section] 1 of the Sherman Act does not prohibit [all] unreasonable restraints of trade . . . *but only restraints effected by a contract, combination, or conspiracy." Bell Atlantic Corp. v. Twombly*, __U.S.__, __, 127 S. Ct. 1955, 1964 (2007) (alteration in original; internal quotation marks and citation omitted; emphasis added). As a leading authority on federal antitrust law has observed, "[t]he several statutory terms for combined action are usually treated interchangeably." VI Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application,* ¶1400 at 1 (2d ed. 2003). In construing Section 1 of the NMAA, we likewise will treat the several statutory terms, "contract, agreement, combination or conspiracy," as interchangeable; and, for the sake of convenience, we will use the term "conspiracy" to encapsulate the concerted action among Defendants required to establish liability under Section 1 of the Sherman Act and Section 1 of the NMAA.

**{20}** Defendants argue that they are entitled to summary judgment because Plaintiffs' evidence does not create a genuine issue of fact as to the material element of a conspiracy to fix prices. Each Defendant's CEO denied having any knowledge of any conspiracy, combination, or agreement among Defendants to fix prices. Although a jury would be free to disbelieve the denials of Defendants' officers, "[a] plaintiff cannot make his case just by asking the jury to disbelieve the defendant's witnesses." *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 655 (7th Cir. 2002). Plaintiffs have not directed our attention to any direct evidence of a conspiracy such as testimony by a witness who was present when representatives of Defendants discussed setting prices. *Cf. City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 557-59, 568 (11th Cir. 1998) (holding inculpatory statements by an officer of alleged conspirator admissible against his employer-principal; observing that the trier of fact could find in favor of the plaintiffs and against the employer based on the admissions of the officer alone).

**{21}** The absence of eyewitness testimony or smoking-gun documents does not mean that Plaintiffs' case necessarily fails. Modern-day antitrust plaintiffs often find direct evidence of a conspiracy hard to come by:

> Judicial decisions that established the Sherman Act's application to written and spoken price-fixing arrangements altered firm behavior . . . . [S]ection 1 drove many cartels underground by forcing participants to take precautions to avoid detection and curtail the generation of evidence of direct communications that might be used to establish the common course of action. The Sherman Act gave firms an incentive to avoid formal contracts or other

10

written instruments in favor of spoken assurances in secret meetings or covert conversations involving industry members. Thus, for prospective cartel participants, the Sherman Act placed a premium on avoiding the generation of evidence (such as written records) from which a factfinder readily could determine that an agreement existed.

William E. Kovacic, *The Identification and Proof of Horizontal Agreements Under the Antitrust Laws*, 38 Antitrust Bull. 5, 17 (1993). It is well established that antitrust conspiracies, like other conspiracies, may be proved circumstantially: "Because direct proof of an illegal agreement is rarely available, an antitrust conspiracy may be proved through the use of circumstantial evidence alone." *Bldg. Indus. Fund v. Local Union No. 3., Int'l Bhd. of Elec. Workers*, 992 F. Supp. 162, 181 (E.D. N.Y. 1996), *aff'd on other grounds by*, 141 F.3d 1151 (2d Cir. 1998) (unpublished opinion). Plaintiffs may establish their claim by presenting circumstantial evidence from which a reasonable factfinder could infer the existence of a conspiracy to fix prices notwithstanding Defendants' denials and the absence of direct evidence of a conspiracy. *In re High Fructose Corn Syrup*, 295 F.3d at 654-55.

**{22}** Inferring an antitrust conspiracy from circumstantial evidence is complicated by a judge-made antitrust doctrine variously known as "conscious parallelism" or "tacit collusion." *Brooks Group*, 509 U.S. at 227. "Since early in the nineteenth century economists have argued that firms in concentrated markets can increase their prices above the competitive level without expressly communicating with one another, and certainly without the need for anything resembling a 'conspiracy' or agreement among the parties." Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice* § 4.2 at 157 (2d ed. 1999). "[C]ourts and commentators have debated for decades whether parallel price changes by oligopolists who recognize their interdependence provide a sufficient basis for a court to infer an unlawful horizontal agreement under Sherman Act § 1, and if not what additional circumstantial evidence is required to prove a conspiracy." Johnathan B. Baker, *Two Sherman Act Section 1 Dilemmas: Parallel Pricing, the Oligopoly Problem, and Contemporary Economic Theory*, 38 Antitrust Bull. 143, 144 (1993). In a highly influential law review article, Professor Donald F. Turner[3] maintained that

> oligopolists who take into account the probable reactions of competitors in setting their basic prices, without more in the way of 'agreement' than is found in 'conscious parallelism,' should not be held unlawful conspirators under the Sherman Act, even though, as in *American Tobacco* [*Co. v. United*

---

[3]"Turner, who had a Ph.D. in economics from Harvard as well as a law degree from Yale, taught for many years at Harvard Law School and was head of the Justice Department's antitrust division for several years during the 1960s. He was the nation's foremost antitrust scholar from the mid-1950s to the late 1970s and one of the first to make economic analysis the lodestar of his approach to antitrust law." Richard A. Posner, *Antitrust Law* 55 n.4 (2d. ed. 2001).

*States*, 328 U.S. 781 (1946)], they refrain from competing in price.

Donald F. Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal*, 75 Harv. L. Rev. 655, 671 (1962). Turner's influence is reflected in statements such as the following:

> Tacit collusion, sometimes called oligopolistic price coordination or conscious parallelism, describes the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions.

*Brooke Group*, 509 U.S. at 227. "Since *Matsushita*, the courts have essentially settled on Turner's approach . . . ." William H. Page, *Communication and Concerted Action*, 38 Loy. U. Chi. L.J. 405, 413 (2007). "The courts are nearly unanimous in saying that mere interdependent parallelism does not establish the contract, combination, or conspiracy required by Sherman Act § 1." VI Areeda & Hovenkamp, *supra*, ¶ 1433a at 236. Following the lead of federal courts as required by NMAA Section 15, we likewise hold that behavior of market participants characterizable as mere conscious parallelism does not satisfy the conspiracy element requirement of NMAA Section 1.

**{23}** The current general acceptance by federal courts of the doctrine of conscious parallelism as a substantive principle of antitrust law has important procedural consequences in a case in which the defendants are oligopolists. Such cases present a risk that the factfinder—typically a jury composed of laypersons unfamiliar with prevailing economic theory and antitrust doctrine—may erroneously attribute the presence of supracompetitive parallelism to a conspiracy, when in fact the parallelism proved by the plaintiff is merely the parallelism inherent in the structure of an oligopoly. Imposing antitrust liability in such circumstances would violate substantive antitrust law creating a safe harbor for conscious parallelism. Under federal antitrust law, a court may not allow a Sherman Act Section 1 case to go to trial unless the court is persuaded that the evidence, viewed in the light most favorable to the plaintiff, would allow a reasonable factfinder to rule out legitimate conscious parallelism as the most likely explanation for the parallelism proved by the plaintiff: "To survive a motion for summary judgment . . . a plaintiff seeking damages for a violation of § 1 [of the Sherman Act] must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita*, 475 U.S. at 588 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).

**{24}** Federal courts typically characterize the evidence required by *Matsushita* as "plus factors." VI Areeda & Hovenkamp, *supra*, ¶ 1434 at 241. Unfortunately, the federal plus factor approach has proven to be more a complication than an analytical tool:

> First, [federal] courts rarely attempt to rank plus factors according to their

12

probative value or to specify the minimum critical mass of plus factors that must be established to sustain an inference that the observed market behavior resulted from concerted conduct rather than from "consciously parallel" choices. Nor have courts generally devoted extensive effort to evaluating the likely competitive effect of each plus factor. This condition makes judgments about the disposition of future cases unpredictable and imparts an impressionistic quality to judicial decision making in agreement-related disputes. . . .

Second, the variation in judicial analysis of plus factors suggests that the outcome in many cases depends upon the court's unarticulated intuition about the likely cause of observed parallel behavior. Judges appear to vary in their acceptance of the proposition . . . that conscious parallelism does not necessarily bespeak concerted behavior. Judges who regard pricing uniformity as a sign of collaboration and market failure will give lip service to [the principle that conscious parallelism does not bespeak concerted behavior] but will expand the range and reduce the quantum of conduct that, when added to parallel behavior, can support a finding of agreement. Thus, some decisions go to great lengths to characterize proof as hinting of collective activity.

On the other hand, judges who see parallelism as a desirable, natural manifestation of rivalry implicitly will hold the plaintiff to more rigorous standards of proof. Where these judges control the panel or court in question, their decisions are likely to display a greater reluctance to give effect to asserted plus factors and a greater willingness to entertain [the] defendants' explanations about why such plus factors implicate conduct that is either procompetitive or essentially benign.

Kovcic, *supra*, at 35-37 (footnotes omitted). In our view, the plus factor approach adds an additional layer of labels without materially advancing the analysis required by *Matsushita*. Rather than deferring to federal precedent accepting or rejecting a given circumstance as a plus factor, we think the sounder approach for a New Mexico court is to engage in an independent and rigorous evaluation of the evidence in deciding whether or not the plaintiff's evidence tends to suggest a degree of coordination that exceeds the parallelism that could be accomplished through lawful conscious parallelism. *See*, *e.g.*, VI Areeda & Hovenkamp, *supra*, ¶ 1434c at 243-244 (critically examining commonly-cited plus factors of "conspiratorial motivation" and "acts against self-interest").

**{25}** We summarize our understanding of conscious parallelism as follows: federal courts, drawing on economic theory, assume that some background level of supracompetitive parallelism in prices is inherent in an oligopoly such as the tobacco industry even in the absence of express coordination of prices. The non-existence of conscious parallelism is not a separate element of the plaintiff's case; rather, the doctrine of conscious parallelism merely

13

supports an alternative, exculpatory inference that may be drawn from the parallelism proved by the plaintiff: i.e., the parallelism proved by the plaintiff is nothing more than the parallelism resulting from lawful conscious parallelism. If the plaintiff comes forward with evidence that would allow a reasonable factfinder to exclude lawful conscious parallelism as the most likely explanation for the parallelism proved by the plaintiff, then the plaintiff has made out a prima facie case that would defeat summary judgment. At trial, then, the burden of negating the exculpatory inference of lawful conscious parallelism simply merges into the plaintiff's ultimate burden of convincing the factfinder that the parallelism proved by the plaintiff was more likely than not the result of a conspiracy.

**{26}** We set out below Plaintiffs' theory of their case as stated in their brief in opposition to summary judgment filed in the district court:

> [I]t is important to keep in mind that [P]laintiffs have not alleged a textbook functioning collusion that eliminated all competition in the market, and they have not alleged a simple market sharing or price fixing cartel. Rather the alleged conspiracy concerns the actions taken by the industry to control the competition that arose in the discount segment of the market in order to extend the "oligopolistic coordination" of the premium segment to the discount segments. This could only be done on an industry-wide basis and it required a major restructuring in the established ways of pricing product.

**{27}** Consistent with our obligation to view the record in the light most favorable to Plaintiffs' theory of their case, we conclude that a factfinder could reason as follows: Marlboro Friday and the industry-wide price reductions that occurred afterward represented the triumph of competition over oligopolistic price coordination. As the result of competitive pressure from the discount segment, the list prices of premium cigarettes substantially declined for the first time in decades. Oligopolistic coordination, which previously had allowed Defendants to increase prices irrespective of the rate of inflation, changes in the costs of production, or shifts in consumer demand, had broken down under the pressure of competition.

**{28}** Defendants were desperate to regain the enormous profits previously generated by premium cigarettes sold at the highly supracompetive prices in effect prior to Marlboro Friday. Philip Morris, the instigator of Marlboro Friday, was itself experiencing a staggering reduction in operating income as a consequence of the post-Marlboro Friday depression in the prices of premium cigarettes. However, no Defendant could raise the prices of its premium cigarettes without losing market share unless the remaining Defendants, including Philip Morris, joined in the increase. Philip Morris could not be expected to raise prices of its premium cigarettes unless it could do so without losing further market share to non-premium cigarettes.

**{29}** Relying on oligopolistic coordination to restore market stability and supracompetive profits would have required Defendants to accept an indeterminate period of depressed

profits. Moreover, because Defendants had divergent interests and because Defendants had limited information about each other's intentions, it would not have been clear to Defendants that lawful oligopolistic coordination would promptly lead to a global solution acceptable to the major manufacturers. Marlboro Friday was itself a demonstration of how badly the oligopolistic coordination that had characterized the industry prior to the introduction of generics had failed in containing the generic segment. Defendants began exchanging signals, possibly supplemented by clandestine communications, knowing and intending that these signals and communications would shape the market, resulting in conditions that would allow prices to immediately begin rising back to pre-Marlboro Friday levels: Philip Morris would relax its stranglehold on the prices of premium cigarettes and allow prices to gradually return to pre-Marlboro Friday supracompetitive levels; and, in return, each of the remaining Defendants—most crucially Brown & Williamson and R.J. Reynolds—would significantly reduce the competition from generic cigarettes, which would reverse the cannibalization of the premium cigarette segment. Defendants settled upon the following method to carry out their anticompetitive scheme: each increase in the prices of premium cigarettes would be matched by a corresponding increase in the prices of discount cigarettes; increases would be spread out over several years to minimize consumer resistance;[4] as prices of discount and premium cigarettes serially rose in tandem, discount cigarettes' sole competitive advantage—proportionally lower prices—gradually would be reduced;[5] and as discount cigarettes gradually lost their competitive advantage, the cannibalization of the premium segment would be reversed.

{30}    The terms of this hypothetical agreement were not necessarily the product of free assent and did not necessarily impose equal burdens on the conspirators. Philip Morris, as the largest and economically most powerful manufacturer, insisted on terms that favored manufacturers with a large presence in the premium segment, such as Philip Morris itself, who would regain market share primarily at the expense of manufacturers heavily invested in the discount segment. Even so, this hypothetical agreement would not have been a lose-lose proposition from the standpoint of any conspirator. First, a conspiracy allowed

---

[4]Our understanding of Plaintiffs' theory of the case does not necessarily require that each subsequent increase have been expressly coordinated by the conspirators. Once an agreement to raise prices of discount and premium cigarettes in tandem was in place, the decision to implement subsequent increases could be left to traditional price leadership.

[5]Assume, by way of example, that discount cigarettes sell at retail for $1.00 per pack and that premium cigarettes sell for $2.00 per pack. At this point, a pack of discount cigarettes has a two to one price advantage over a pack of premiums. Assume that the industry adopts a $.50 increase in the price of each type of cigarette and that discount cigarettes now sell at retail for $1.50 per pack and that premium cigarettes sell for $2.50 per pack. The *absolute* price difference between discount and premium cigarettes remains $1.00, but the *proportional* price advantage of discount cigarettes has been reduced.

15

immediate relief from the depression in the prices of premium cigarettes.  Second, because a conspiracy would result in higher prices for discount cigarettes, not just premium cigarettes, losses in the discount market segment would be offset by higher profits per pack on both discount and premium cigarettes.[6]  The alleged conspiracy was in place by November 1993, when the first in-tandem increase in the prices of premium and discount cigarettes occurred.

{31}    Bearing in mind our obligation to view the evidence in the light most favorable to the non-movant and to allow the non-movant the benefit of any reasonable inferences supported by the evidence, we conclude that Plaintiffs' theory of their case is economically plausible.  It accounts for the in-tandem increases in the prices of generic and premium cigarettes beginning in November 1993, as well as the shifts in market share that occurred as the competitive advantage enjoyed by discount cigarettes eroded over time.  It explains why those Defendants who were heavily invested in the discount market segment acted against their apparent interest in agreeing to a scheme that reduced their respective market shares.  Further, it does not depend on a showing that there was no competition at all within the cigarette industry.[7]

{32}    We next consider whether Plaintiffs have come forward with evidence that would permit a reasonable factfinder to rule out conscious parallelism as the most likely explanation for the parallelism exhibited by the tobacco industry subsequent to Marlboro Friday.  As previously noted, the judicial doctrine of conscious parallelism is grounded in economic theory about the functioning of concentrated markets.  Testimony by a qualified economics expert that the character or degree of parallelism actually exhibited by prices exceeds the parallelism that economic theory predicts would result from independent competitive behavior is precisely the type of evidence that tends to exclude the possibility that the defendants acted independently; and in our view, it constitutes an extremely forceful "plus factor" because, as evidence derived from economics, it directly engages the assumptions on which the judicial doctrine of conscious parallelism depends.  In the present case, Plaintiffs' expert, Keith Leffler, Ph.D., stated in his opinion that "[t]he economic evidence indicates that it is highly unlikely that independent competitive behavior explains the price restructuring and price changes for cigarettes during the alleged conspiracy period."  Dr. Leffler's opinion is backed up by his detailed analysis of the cigarette industry.  Dr. Leffler's opinion testimony, if believed, would permit a reasonable factfinder to exclude lawful parallelism as the most likely explanation for the parallelism demonstrated by cigarette prices during the class period.  We hold that Dr. Leffler's testimony is sufficient

---

[6]Because the conspiracy contemplated supracompetitive profits from *both* premium and generic cigarettes, pre-Marlboro Friday profits would be realized even before the prices of premium cigarettes reached pre-Marlboro Friday levels.

[7]In other words, the competition that occurred in the course of the conspiracy was among products all of which were priced supracompetitively as a consequence of the conspiracy.

to meet Plaintiffs' burden of production under *Matsushita*.

**{33}** Furthermore, Dr. Leffler's conclusion is supported by existing Supreme Court precedent. Although the United States Supreme Court appears to have accepted conscious parallelism as a plausible explanation for the simple parallelism in prices demonstrated by premium cigarettes in the post-World War II era prior to the introduction of discount cigarettes, *Brooke Group*, 509 U.S. at 213 (implying that the Court did not view lockstep, twice-yearly increases in prices of premium cigarettes in the decades prior to the introduction of generic cigarettes as the product of unlawful price fixing), the Supreme Court clearly was much less willing to accept conscious parallelism as a plausible explanation for more complex, "multi-variable," parallel pricing scenarios, *id.* at 239 (observing that "the inherent limitations of tacit collusion suggest that such multi-variable coordination is improbable").

**{34}** In *Brooke Group*, Liggett did not allege a conspiracy, as Plaintiffs have done in the present case. Rather, Liggett alleged that Brown & Williamson had "cut prices on generic cigarettes below cost and offered discriminatory volume rebates to wholesalers to force Liggett to raise its own generic cigarette prices and introduce oligopoly pricing in the economy [cigarette] segment" *Id.* at 212. In order to prove its theory, Liggett had to demonstrate that there was a likelihood that the predatory scheme would result in Brown & Williamson's being able to recoup the losses it incurred in implementing the scheme. *Id.* at 225. Liggett theorized that Brown & Williamson sought to recoup by preserving supracompetitive profits on premium cigarettes by way of conscious parallelism. *Id.* at 227. In other words, Brown & Williamson relied on the idea that all cigarette manufacturers would independently decide to follow Brown & Williamson's lead in pricing and that the ultimate result would be preservation of supracompetitive pricing.

**{35}** The Supreme Court concluded that such conscious parallelism would have been "unmanageable" in light of the large number of cigarette types and pricing variables that existed in the industry at the time. *Id.* at 238-39.

> The Court expressed great skepticism about [Liggett's] claim of a complex chain of causes and effects under which [Brown & Williamson] would first enter the market with its generic in competition with Liggett at the same list prices but with large rebates, thereby realizing net prices below its costs; Liggett would offer similar rebates, suffer serious losses, and yield to this predation by raising its list prices; *thereafter, all firms producing generics would reach tacit consensus on price; the price gap between branded cigarettes and generics would then decrease, and both would stabilize at oligopoly levels.*

III Areeda & Hovenkamp, *supra*, ¶ 726 at 316 (emphasis added). As *Brooke Group* demonstrates, there are limits to the Supreme Court's willingness to accept conscious parallelism as a plausible explanation for complex types of parallelism. Although conscious

parallelism in *Brooke Group* was part of the plaintiff's theory in that case, while it is Defendants' primary defense theory in the present case, the Supreme Court's analysis is equally applicable in both cases: conscious parallelism in a complex, multi-variable industry is "improbable." 509 U.S. at 239.

**{36}** Defendants' theory of the present case seems to us to be easily as complex as the recoupment theory rejected in *Brooke Group*. The lesson we draw from *Brooke Group* is that the exculpatory inference arising from the doctrine of conscious parallelism becomes weaker as the chain of causes and effects it is offered to explain becomes more complex and as the economic interests of the participants in the market diverge. *Id.* at 239-40. Indeed, Defendants' reliance on conscious parallelism to explain the extraordinary parallelism exhibited by the cigarette prices following Marlboro Friday is reminiscent of the "alignment of interest" theory, *Liggett Group*, 748 F. Supp. at 357, unsuccessfully advanced by Liggett in *Liggett Group* and *Brooke Group*.

**{37}** Further, we have the benefit of several years of history subsequent to the events recounted in *Brooke Group*. As noted in *Brooke Group*, during the latter half of the 1980s, list prices of generics began to mimic the lockstep, twice-a-year price increases of premium cigarettes, 509 U.S. at 218, a pattern suggesting that the price competition from generic cigarettes had been co-opted by oligopolistic price coordination. However, Liggett once again stepped into the competitive breach, this time introducing "subgeneric"(also called "deep discount") cigarettes, priced even lower than generic cigarettes. *Id.* at 236. Deep discount cigarettes provided an important competitive check on the prices of premium cigarettes. Most notably, a decrease in the wholesale prices of deep discount cigarettes in February to June 1992 was followed by a corresponding decrease in the wholesale prices of discount cigarettes beginning in June 1992. *Structure of American Industry*, Fig. 3-6 at 59. The decrease in the prices of discount cigarettes broke the previously established pattern of in-tandem increases in the prices of discount and premium cigarettes, reopening the price gap between discount and premium cigarettes. *Id.* Competition—this time in the form of deep discount cigarettes—trumped oligopolistic price coordination. Further, when Philip Morris attempted to lead increases in the prices of discount cigarettes in 1992 and 1993, Brown & Williamson and R.J. Reynolds did not follow its lead and Philip Morris was forced to retract each of the increases. *Id.* This evidence reinforces Dr. Leffler's opinion that by itself, lawful oligopolistic coordination was incapable of containing the competition from non-premium cigarettes.

**{38}** Although we are not bound by the Eleventh Circuit Court of Appeals' decision, we believe that it will be helpful to the parties, and to the readers of this opinion, if we explain some of the major points of departure between our reasoning and that of the federal courts in *Holiday Wholesale Grocery Co.* and *Williamson Oil Co*.

**{39}** First, and most significantly, we have Dr. Leffler's opinion. Dr. Leffler's report was not in the record before the federal courts. We are not inclined to appoint ourselves amateur economists and attempt to second guess Dr. Leffler's reasoning, nor are we inclined to

engage in a sua sponte evaluation of the admissibility under Rule 11-702 NMRA of Dr. Leffler's opinions.[8] *See Chavez v. Ronquillo*, 94 N.M. 442, 445, 612 P.2d 234, 237 (Ct. App. 1980) (observing that party objecting to trial court's consideration of evidence in ruling on motion for summary judgment bears the burden of moving to exclude such evidence; in the absence of an objection, the trial court may consider such evidence in ruling on a summary judgment motion).

**{40}** Second, our reading of *Brooke Group* indicates to us that we should be cautious in accepting conscious parallelism as an explanation for complex, multi-variable, multi-price-tier parallelism. The federal courts in *Holiday Wholesale Grocery Co.* and *Williamson Oil Co.* may have fallen into the error of giving the Supreme Court's dicta—i.e., "[t]acit collusion . . . describes the process, not in itself unlawful"—which comes handily packaged in quotable form, more consideration than the Supreme Court's actual analysis of the likelihood that tacit collusion could result in industry-wide, in-tandem increases in the prices of both generic and premium cigarettes. *Brooke Group*, 509 U.S. at 227. The present case does not involve the type of simple price leadership in a single-tier market that characterized the tobacco industry prior to the introduction of generic cigarettes.

**{41}** Third, we have some concern that the Eleventh Circuit Court of Appeals misinterpreted *Matsushita* so as to place an undue burden on antitrust plaintiffs alleging horizontal price fixing. *Williamson Oil Co.*, 346 F.3d at 1300. When the Supreme Court in *Matsushita* referred to the costs of "mistaken inferences" that "chill the very conduct the antitrust laws are designed to protect," 475 U.S. at 594, it was speaking in the specific context of allegations of predatory pricing, which requires the factfinder to find an anticompetitive conspiracy in the face of evidence that the defendants set prices *below* a competitive level. A mistaken inference of conspiracy in such a case punishes the defendants for engaging in cut-to-the-bone competition—truly the very type of behavior that antitrust laws are designed to protect. *See In re Flat Glass Antitrust Litigation*, 385 F.3d 350, 357 (3d Cir. 2004) (distinguishing *Matsushita)*. The conduct at issue in the present case— supracompetitive pricing—is conduct that at best is tolerated by antitrust law. "[W]hile predatory pricing threats like the one in *Matsushita* always risk chilling procompetitive behavior, no comparable policy reasons justif[y] reluctance about going after a naked price fixing conspiracy," such as the conspiracy alleged in the present case. II Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 308 at 147 (3d ed. 2006). We therefore have the same concern—no more, no less—that we have for any other class of defendants in protecting Defendants from mistaken inferences of culpable conduct.

**{42}** Moreover, the predatory pricing claim in *Matsushita* was economically implausible on its face: "*Matsushita* spoke in the context of an alleged highly implausible decades-long

---

[8]Indeed, at this point it is not entirely clear whether Dr. Leffler's opinions are being offered as scientific or as non-scientific expert opinion evidence.

predatory pricing conspiracy and found a severe proof requirement in such cases." II Areeda & Hovenkamp, *supra*, ¶ 308c3 at 137-38. Where a claim is plausible and does not implicate facially procompetitive behavior, "more liberal inferences from the evidence should be permitted than in *Matsushita* because the attendant dangers from drawing inferences recognized in *Matsushita* are not present." *In re Flat Glass Antitrust Litigation*, 385 F.3d at 358 (quoting *Petruzzi's IGA v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993) (internal quotation marks omitted). "[I]n a case in which conspiracy is deemed quite plausible, perhaps by virtue of the industry's structure and past attempts at collusion, then a broader range of inferences can be drawn from ambiguous evidence." II Areeda & Hovenkamp, *supra*, 308c3 at 139. In the present case, the alleged conspiracy among Defendants is plausible, especially given the improbability that the pricing that occurred was the result of conscious parallelism. *See Brooke Group*, 509 U.S. at 239 (observing that "the inherent limitations of tacit collusion suggest that such multivariable coordination is improbable").

**{43}** Lastly, consistent with New Mexico summary judgment standards, we have taken seriously our obligation to construe the record in the light most favorable to Plaintiffs and to allow Plaintiffs the benefit of any reasonable inferences. Thus, for example, we have recognized that certain Defendants may have been reluctant participants, joining in the conspiracy because they lacked the financial resources to resist Philip Morris. *See* VI Areeda & Hovenkamp (2d ed. 2003), *supra*, ¶ 1408c at 46-47 (concluding that a competitor who reluctantly participates in a cartel under economic duress may be held liable as a conspirator). Similarly, we have viewed changes in market share during the class period as consistent with a conspiracy in which Philip Morris, as the most powerful conspirator, insisted on terms favorable to manufacturers of premium brands such as Philip Morris itself. We have been mindful of Plaintiffs' theory of their case, which does not involve an allegation that Defendants conspired to eliminate all competition; rather, Defendants were willing to compete as long as they were competing over supracompetitive profits.

**CONCLUSION**

**{44}** To summarize, Plaintiffs have come forward with evidence that during the class period the tobacco industry exhibited an unprecedented degree of parallelism, beginning with the July 1993 consolidation of what had previously been ten price tiers into two price tiers, and continuing through twelve in-tandem increases in the prices of both premium and discount cigarettes. This multi-variable, multi-price-tier parallelism goes well beyond the price leadership within a single-tier market demonstrated by the cigarette industry prior to the introduction of generic cigarettes. Further, the parallelism in the present case involves parallelism among market tiers which formerly had been in vigorous competition, resulting in a significant differential between the list prices of the cheapest cigarettes and the most expensive cigarettes. Attempts by Philip Morris in 1992 and 1993 to lead increases in the prices of non-premium cigarettes failed. The spectacular growth curve of the non-premium segment suggests that the demand among consumers for competitively priced cigarettes had not peaked as of Marlboro Friday. Indeed, as previously noted, Marlboro Friday represents

the triumph of competition over oligopolistic price coordination, suggesting that as of Marlboro Friday, competition was thriving within the tobacco industry. Applying *Brooke Group*, and relying on the opinions of Dr. Leffler, we think that a reasonable factfinder could view conscious parallelism as a relatively implausible explanation for the anticompetitive scenario that played out following Marlboro Friday.

**{45}** We certainly do not mean to suggest that Plaintiffs' evidence *requires* a reasonable factfinder to accept unlawful concerted action as the most likely explanation for the parallelism demonstrated by cigarette prices: a reasonable factfinder might reject Dr. Leffler's opinions or accept as truthful the testimony of Defendants' CEOs denying participation in a conspiracy. We hold merely that Plaintiffs' evidence *allows* a reasonable factfinder to reject conscious parallelism as a plausible explanation, thereby leaving the competing inference of conspiracy as the most likely explanation for the parallelism proven by Plaintiffs.

**Lorillard & Liggett**

**{46}** In its answer brief, Lorillard points out that Plaintiffs' expert, Dr. Leffler, testified during his deposition that he was unaware of any conduct by Lorillard during the class period that was not "completely consistent with conscious parallelism." In their reply brief, Plaintiffs have not addressed this crucial point. Plaintiffs' case against Liggett suffers from the same deficiency as their case against Lorillard: Dr. Leffler testified that he is unaware of any conduct by Liggett that is not either procompetitive or consistent with conscious parallelism. In view of Dr. Leffler's concessions, we conclude that Plaintiffs have not satisfied their burden under *Matsushita* of coming forward with evidence that would allow a reasonable juror to exclude lawful conscious parallelism as the most likely explanation for Lorillard's and Liggett's adoption of parallel price increases. Accordingly, we affirm the grant of summary judgment as to these two Defendants. We reverse the summary judgment in favor of Defendants Philip Morris, Brown & Williamson, and R.J. Reynolds.

**{47}    IT IS SO ORDERED.**

 

**A. JOSEPH ALARID, Judge**

 

**WE CONCUR:**

 

**CYNTHIA A. FRY, Judge**

 

**RODERICK T. KENNEDY, Judge**

21

Topic Index for *Romero v. Philip Morris, Inc.*, No. 26,993

**AE**        **Appeal and Error**
AE-SR      Standard of Review

**CM**        **Commercial Law**
CM-AN     Antitrust

**FL**        **Federal Law**
FL-PR      Procedure