**Certiorari Denied No. 31,638, April 8, 2009**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMCA-042**

**Filing Date:  MARCH 3, 2009**

**Docket No. 27,728**

**IDA EISERT,**

> **Petitioner-Appellant,**

**v.**

**ARCHDIOCESE OF SANTA FE, OUR
LADY OF BELEN PARISH CEMETERY,
and OUR LADY OF BELEN MEMORIAL
GARDENS,**

> **Respondents-Appellees.**

**APPEAL FROM THE DISTRICT COURT OF VALENCIA COUNTY
John W. Pope, District Judge**

Kalm Law Office, P.C.
Thomas L. Kalm
Albuquerque, NM

for Appellant

Charles P. Reynolds
Albuquerque, NM

for Appellees

**OPINION**

**FRY, Chief Judge.**

**{1}**     This appeal arises from summary judgment in favor of Respondents  Archdiocese of Santa Fe, Our Lady of Belen Parish, and Our Lady of Belen Memorial Gardens (collectively "the cemetery").  Petitioner Ida Eisert sued the cemetery and made a number of allegations arising from the burial of her father, Juan Castillo.  Eisert alleged that the cemetery breached

her father's plot reservation contract and the contract for her father's burial, violated the Unfair Practices Act (UPA), NMSA 1978, §§ 57-12-1 to -26 (1967, as amended through 2007), and violated NMSA 1978, § 30-12-12 (1989), a criminal statute making it a felony to disturb a burial ground. We affirm the district court's grant of summary judgment in favor of the cemetery as to all of Eisert's allegations.

## I.    BACKGROUND

{2}    The dispute below arose over the placing of the remains of three individuals—Eisert's father, Juan Castillo, her mother, Severita Castillo, and her stepmother, Sofie[1] Castillo—in the cemetery. Severita, Juan's first wife, was the first to be buried when she died in 1970. Around the time of Severita's burial, Juan reserved the plot adjacent to Severita for his own eventual burial and, according to Eisert, he purchased a joint headstone with both his and Severita's names engraved on the stone.

{3}    Juan remarried a few years after Severita's death. His new wife, Sofie, had two children from a previous marriage, neither of whom is a party to this case. In 1996, after many years of marriage to Sofie, Juan returned to the cemetery and signed a plot reservation application that memorialized his previous reservation of the plot next to Severita. Around that same time, Sofie reserved a burial plot for herself that was located next to Juan's plot. The cemetery map indicated that this was a vacant plot and, because Sofie and Juan wished to be buried together, Sofie signed a plot reservation application and paid for the plot. Thus, the locations of the pre-purchased burial plots indicated that Juan would be buried between his two wives with Severita on one side and Sofie on the other. Eisert was not involved with the plot reservation activities of Juan or Sofie.

{4}    On May 29, 2002, after thirty years of marriage to Sofie, Juan died. At that time, Sofie arranged to have Juan buried in the plot he had reserved at the cemetery and entered into a burial contract that specified the various fees associated with Juan's burial as well as the specific details of the funeral services. The burial contract indicated that Juan would be buried in his pre-paid burial plot next to Severita. After Sofie made the burial arrangements, the cemetery staff began to excavate the grave in preparation for Juan's burial. During this excavation, the staff discovered that unidentified human remains were buried in the plot that Sofie had reserved for herself next to Juan's plot. Because the cemetery had been in operation since the civil war, the staff occasionally found bodies in unrecorded graves. Having made this discovery, the manager of the cemetery drove to Sofie's house and informed Sofie that her pre-purchased burial plot was occupied and therefore unavailable for her future burial. The manager offered Sofie two options at that point. She could either opt

---

[1]There is some confusion regarding the spelling of the second Mrs. Castillo's name. The parties generally spell the name "Sophie," while at least one document in the record shows that Mrs. Castillo signed her name as "Sofie." We use the spelling employed by Mrs. Castillo herself.

2

to have a different burial plot located in another part of the cemetery, or she could have Juan's grave excavated at double depth so that she could be buried in the same plot as her husband of thirty years. Sofie chose the latter option, and the cemetery staff proceeded to excavate the grave at double depth and bury Juan as the first burial in the double-depth plot. The cemetery manager then made a notation on Juan's burial contract that his grave was to be double depth with Sofie and made a notation on Sofie's plot reservation application that her plot was changed to double depth with Juan.

{5} Sofie died two years later. Pursuant to the arrangement Sofie had made with the cemetery, Sofie's children arranged to have her buried as the second burial in the double-depth plot occupied by Juan. Sofie's stepchildren, including Eisert, were not involved in the arrangements for Sofie's burial. A month or so after Sofie's funeral, apparently Eisert went to the cemetery to pay her respects to Severita and Juan. She noticed that the ground over Juan's grave appeared to have been disturbed, made an inquiry with the groundskeeper, and was informed that her stepmother Sofie had been buried above Juan in the double-depth grave. Until that time, Eisert had not been aware that her stepmother had died or that Juan's grave had been excavated at a deeper depth prior to his burial to accommodate the later burial of Sofie.

{6} Following her discovery, Eisert filed a petition for disinterment and complaint for breach of burial contract in the district court against the cemetery. The complaint sought damages for breach of contract, punitive damages to deter future conduct, damages for mental anguish, and the disinterment of Sofie's body.

{7} The cemetery moved for summary judgment on the ground that, as a matter of law, it did not breach the burial contract or violate the UPA. The district court granted the motion, holding that there were no material facts to support a claim of breach of contract or unfair practices and that Eisert was not a party to, or a third party beneficiary of, any contract relevant to the case. Eisert appealed.

## II. DISCUSSION

### A. Standing

{8} The cemetery argues that Eisert does not have standing to assert the claims alleged. Eisert asserts that she has standing both as a third-party beneficiary of the burial contract entered into by Sofie for the burial of Juan and as Juan's heir. We agree with Eisert that family members are third-party beneficiaries of burial contracts such that they may sue for breach of a burial contract, and we therefore do not address her argument that she also has standing as Juan's heir.

{9} Our Supreme Court has previously addressed the question of whether a family member who is not a party to a burial contract has standing to bring a cause of action for the breach of the burial contract and noted that "it is common knowledge that contracts for

3

funeral services are intended to benefit the family of the deceased" and that funeral services "are rarely performed for the benefit of the contracting party alone." *Flores v. Baca*, 117 N.M. 306, 310, 871 P.2d 962, 966 (1994) (internal quotation marks and citation omitted). Thus, the Court held that "surviving family members may be implied in fact to be the intended beneficiaries of funeral and burial contracts." *Id.* at 311, 871 P.2d at 967 (emphasis omitted). Under the holding of *Flores*, we conclude that Eisert, as a surviving member of Juan's family, is a third-party beneficiary of the burial contract entered into by Sofie for Juan's burial and therefore has standing to sue for an alleged breach of that contract. Thus, the district court erred in finding that Eisert did not have standing. Despite this error, the district court properly granted summary judgment, as we explain below. *See C & H Constr. & Paving Co. v. Citizens Bank,* 93 N.M. 150, 156, 597 P.2d 1190, 1196 (Ct. App. 1979) (noting that "we are not bound by those grounds purportedly used by the [district] court as the basis for the granting of summary judgment").

## B.    Summary Judgment

### 1.    Standard of Review

**{10}**    "An appeal from the grant of a motion for summary judgment presents a question of law" that we review de novo. *Tafoya v. Rael*, 2008-NMSC-057, ¶ 11, 145 N.M. 4, 193 P.3d 551 (internal quotation marks and citation omitted). "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Id.* We review the record in the light most favorable to support a trial on the merits, *Weise v. Washington Tru Solutions, L.L.C.*, 2008-NMCA-121, ¶ 2, 144 N.M. 867, 192 P.3d 1244, and we "construe all reasonable inferences from the record in favor of the party that opposed" summary judgment. *Hamberg v. Sandia Corp.*, 2008-NMSC-015, ¶ 7, 143 N.M. 601, 179 P.3d 1209 (internal quotation marks and citation omitted). However, the party opposing summary judgment has the burden to "show at least a reasonable doubt, rather than a slight doubt, as to the existence of a genuine issue of fact." *Ciup v. Chevron U.S.A., Inc.*, 1996-NMSC-062, ¶ 7, 122 N.M. 537, 928 P.2d 263. To meet this burden, the party "cannot rely on the allegations contained in its complaint or upon the argument or contention of counsel to defeat it. Rather, the opponent must come forward and establish with admissible evidence that a genuine issue of fact exists." *Id.* (citations omitted). Thus, in order to defeat the cemetery's summary judgment motion, Eisert had to direct the court to specific evidence that demonstrated a material issue of fact on her claims of breach of contract and unfair or deceptive trade practices. We hold that Eisert failed to meet this burden and that summary judgment was appropriate with respect to each of her claims.

### 2.    Breach of Contract

**{11}**    There are three contracts that are at issue in this case: (1) the pre-paid plot reservation application signed by Juan in 1996 reserving a plot for Juan next to his first wife, Severita; (2) the pre-paid plot reservation contract signed by Sofie reserving a plot for Sofie next to Juan that was modified in 2002 to provide for a double burial with Juan in the plot

4

next to Severita; and (3) the actual burial contract for Juan's burial, which was created the day after Juan died, and which provided that Juan's grave was to be excavated at double depth to accommodate a double burial with Sofie.

**{12}** Eisert argues that the cemetery breached Juan's pre-paid plot reservation contract and the burial contract by burying Juan and Sofie in the same burial plot. In addition, Eisert argues that the burial contract imposed a duty on the cemetery to act in good faith, which required the cemetery to give notice to Juan's children before any changes were made to Juan's burial plot.

**{13}** In an attempt to meet her burden on appeal from summary judgment, Eisert argues that there is a factual dispute as to whether Sofie had actually agreed to have Juan's plot excavated at double depth because there is nothing in writing from Sofie indicating that she ever agreed to a double-depth burial. In support of this argument, Eisert attested that she was present when Sofie made the burial arrangements for Juan and that there was no discussion of a double-depth burial at that time. The evidence presented by the cemetery, however, indicates that the discussions regarding the double-depth burial took place *after* the initial burial planning discussion at which Eisert was present. According to the affidavits of the cemetery caretaker, Sofie's daughter, and the cemetery employee who excavated the burial plot, the unidentified body in Sofie's plot was not discovered until after the arrangements had been made for Juan's burial. These affidavits also indicate that when the cemetery discovered the unidentified body, its employees informed Sofie that her plot was unavailable and that she agreed to have Juan's grave excavated at double depth and to be buried in that same plot upon her death. Thus, the fact that the double-depth plot was not discussed when Eisert was present does not create a dispute of fact in this case because none of the parties were aware of the need for a double-depth plot until the following day. The cemetery presented prima facie evidence that the burial contract contemplated a double depth excavation, and Eisert has not presented any evidence contradicting that fact.

**{14}** Eisert cites *Sisneros v. Citadel Broadcasting Co.*, 2006-NMCA-102, 140 N.M. 266, 142 P.3d 34, in support of her argument that a genuine issue of material fact exists regarding whether Sofie consented to be buried in a double-depth burial plot with Juan. While Eisert's counsel has failed to explain *Sisneros*'s application to this appeal, it appears that Eisert relies on *Sisneros* because we reversed summary judgment in that case and held that conflicting deposition testimony on the issue of misrepresentation necessitated testimony before a fact finder. *Id.* ¶ 29. By contrast, in this case there is no conflicting testimony regarding Sofie's decision to be buried in a double-depth grave with Juan.

**{15}** Thus, Eisert has failed to meet her burden of pointing to evidence that would create a dispute of material fact as to whether Sofie agreed to have the grave excavated at double depth. The undisputed facts in this case establish that while Juan and Sofie had originally desired to be buried side by side, this arrangement was impossible due to the presence of an unidentified body in the burial plot Sofie had reserved. Sofie therefore agreed to have Juan's grave excavated at double depth so that she could be interred above him, and the cemetery

modified Juan's and Sofie's contracts, pursuant to Sofie's wishes, to reflect the new burial arrangements.

**{16}** Having found that no material issue of fact is disputed in this case, we next address whether the cemetery was entitled to judgment as a matter of law. *See Tafoya*, 2008-NMSC-057, ¶ 11 (noting that the movant must establish that there is no disputed issue of fact and that she is entitled to judgment as a matter of law). The cemetery argues that Sofie, as Juan's surviving spouse, had the sole statutory right to make the decisions regarding Juan's burial, that Sofie contracted for a double burial and that, by burying Juan and Sofie in the same plot the cemetery fulfilled its contractual obligations to Sofie. In addition, the cemetery maintains that it owed no duty to notify Eisert about the double depth burial or to seek her approval and that it had no contractual obligation to allow only one burial in Juan's pre-paid burial plot.

**{17}** The applicable statute, NMSA 1978, § 24-12A-2 (1995), provides that "[i]f a decedent has left no written instructions regarding the disposition of his remains" the decedent's surviving spouse "shall determine the means of disposition." Thus, if Juan left no written instructions regarding the disposition of his remains, then Sofie had the statutory right to determine where, when, and how Juan's remains would be disposed of.

**{18}** Eisert argues that Juan's application for a reserved burial plot constitutes written instructions for the disposition of his remains. Juan's plot reservation contract states that his plot location *preference* is plot P-1-6, which was next to Juan's first wife, Severita Castillo. We question whether Juan's prepaid burial plot preference constitutes the type of written burial instructions contemplated by Section 24-12A-2 and whether the language of the document is sufficiently concrete to create a contractual obligation to bury Juan in that plot. *Cf.* NMSA 1978, § 24-12A-1 (1993) (stating that an individual can only authorize a cremation by including an express provision in his will or by stating his desire to be cremated in a notarized written statement witnessed by two persons). However, viewing all of the evidence in the light most favorable to the party opposing summary judgment, we assume, without deciding, that the plot reservation application constituted a written instruction for the disposition of Juan's remains.

**{19}** Even with this assumption, the actions taken by Sofie and the cemetery were not inconsistent with Juan's wishes. Juan contracted to be buried in plot P-1-6 next to his first wife. Juan was in fact buried in plot P-1-6, the plot next to his first wife. Thus, even if Juan's plot reservation constituted a written instruction as Eisert argues, both Sofie and the cemetery complied with this instruction by burying Juan in the plot he had reserved. The contract specified only *where* Juan was to be buried. Nothing in the contract indicated that Juan contracted specifically for a single plot such that a double burial in his pre-paid plot would constitute a breach of the contract or that, as Eisert argues, Juan intended for Sofie to be buried at the same depth as, or in Eisert's words, "within arm's reach of," Severita. Instead, the plot reservation merely provided guidance to Sofie regarding the fact that Juan wished to be buried in the plot next to his first wife, not that he had specifically

6

contemplated being the sole occupant of his pre-paid burial plot or being buried at a precise depth within the plot.

**{20}**    Because Juan's plot reservation application only provided guidance as to where he wished to be buried, it was still necessary for Sofie to arrange the details of Juan's burial. Sofie's right to arrange these details derived from Section 24-12A-2, which allowed Sofie to determine the means of disposition of Juan's remains as his surviving spouse, and from a document Juan had drafted with a funeral home in 1997 indicating that Sofie was the authorized person to arrange final details for his burial. Thus, Sofie alone had the authority to make the arrangements regarding Juan's burial. In the course of making these arrangements, Sofie entered into a burial contract with the cemetery, which provided that Juan was to be buried in Section P-1-6, the plot he had reserved. The undisputed facts establish that Sofie then became aware of the fact that her reserved spot was unavailable. She therefore contracted with the cemetery to have Juan's grave excavated at double depth so that she could be buried above her husband of thirty years when she eventually died. The undisputed evidence therefore establishes that Sofie acted within the scope of her authority to determine the disposition of Juan's remains when she decided to convert Juan's single plot into a double plot and that the cemetery acted in accordance with its contractual obligations to bury both Juan and Sofie in the same plot when it completed the double burial upon Sofie's death.

**{21}**    Eisert also argues that the burial contract for Juan's burial imposed on the cemetery a duty to Juan's surviving family members to ensure that Juan's "remains would be undisturbed after his burial and that he would forever have his own place of respect." Eisert also argues that this duty required the cemetery to notify Juan's surviving children that his burial plot was being reopened to allow Sofie's burial so that they would have the opportunity to object. In support of this argument, Eisert cites *Jaynes v. Strong-Thorne Mortuary, Inc.*, 1998-NMSC-004, 124 N.M. 613, 954 P.2d 45, and *Flores*, two cases in which our Supreme Court has addressed the duties that arise from a burial contract. In *Flores*, a funeral home had negligently embalmed a body and when the body was exhumed for an autopsy, the surviving family members observed mold, decomposition, and sloughing skin on the body of their deceased father and smelled a strong stench of decay emanating from his remains. 117 N.M. at 309, 871 P.2d at 965. Our Supreme Court noted that negligent funeral services may give rise to claims for breach of contract because an implied term of the contract was to render the services with reasonable skill and care. *Id.* at 310, 871 P.2d at 966. Because the burial contract was intended to benefit the surviving family members of the deceased, the Court recognized that the burial contract imposed an obligation on the funeral director to ensure that the funeral services properly respected the surviving family members and preserved the sanctity of the burial. *Id.*

**{22}**    In *Jaynes*, a family saw the exposed remains of their mother after a cemetery worker accidentally broke through a casket while preparing a grave for another family member. 1998-NMSC-004, ¶¶ 3-7. Our Supreme Court again recognized that burial contracts create certain expectations in the family of the deceased and are intended to help "ease the pain of

7

the family." *Id.* ¶ 15. The Court then noted that because the cemetery had damaged the casket and exposed the remains while preparing the grave, had failed to take measures to prevent the damage, and had failed to take measures to protect the damaged casket or hide the remains from the view of the surviving family, the cemetery had improperly performed the burial contract and could be subject to a breach of contract claim. *Id.* ¶¶ 15-16, 28.

**{23}** In contrast to *Flores* and *Jaynes*, where the cemeteries had engaged in conduct that breached the implied obligations of a burial contract to perform the funeral services in a reasonable manner, Eisert has not demonstrated that the cemetery did anything that would constitute a breach of the implied obligations imposed by a burial contract. Eisert alleges that the cemetery violated the duty that our Supreme Court recognized in *Flores* and *Jaynes* when the cemetery excavated Juan's burial site and buried Sofie in the same burial plot. Under different circumstances, Eisert may be correct that an implied element of an ordinary burial contract is that the burial site will not be reopened and that another body will not be buried on top of the deceased. Here, however, the undisputed facts establish that Sofie specifically contracted for the double burial when she entered into the contract for Juan's burial. Thus, the only way that the cemetery could fulfill its express contractual obligation to bury Juan and Sofie in the same burial plot was to reopen Juan's burial plot when Sofie died. The cemetery had no obligation to notify Juan's children or give them an opportunity to object to the completion of its contractual obligations. Burying an individual with the express consent of the person who had the authority to authorize the first burial, as happened in this case, is not a breach of the burial contract. The district court therefore properly granted summary judgment to the cemetery with respect to Eisert's breach of contract claims, and we affirm the district court's judgment.

### 3.    Unfair Trade Practices Claim

**{24}** Eisert next argues that the cemetery violated the UPA by selling and being paid for three burial plots and only providing two. There is no dispute that three burial plots were purchased in this case. Juan purchased a plot for his first wife, Severita, and the adjacent plot for his own burial. Sofie then purchased the plot next to Juan's plot. There is also no dispute that Juan and Sofie were interred in the same burial plot and that the plot Sofie had reserved was not provided to her because an unidentified body was found in the plot while Juan's plot was being prepared. Thus, there are no disputed issues of material fact with respect to Eisert's UPA claim.

**{25}** For purposes of determining whether summary judgment was appropriate, we consider whether under the undisputed facts of this case the cemetery was entitled to judgment as a matter of law. Eisert argues that the cemetery violated the UPA by failing to "deliver the quality or quantity of goods or services contracted for" because the parties had

8

purchased three burial plots and actually received only two.[2]  In response, the cemetery argues that it did not violate the UPA because it had informed Sofie that it was not possible to use the third burial plot and Sofie had agreed to be buried in a double-depth plot with Juan.  In addition, the cemetery argues that its policy and procedures manual, which is referenced in the burial contract, allows modifications to burial contracts in the event that a burial plot is unavailable due to the presence of another body.  Thus, the cemetery argues that although it did not provide three separate burial plots, it provided what Sofie had contracted for and therefore did not violate the UPA.  While we agree with the cemetery's argument, we affirm the district court for a more fundamental reason—Eisert has not only failed to provide sufficient evidence to overcome a motion for summary judgment, but she has also failed to even allege a violation of the UPA.

**{26}**   The UPA prohibits unfair or deceptive trade practices.  § 57-12-3.  An unfair trade practice is defined as an

> act specifically declared unlawful pursuant to the [UPA], a false or misleading oral or written statement, visual description or other representation of any kind *knowingly made* in connection with the sale . . . of goods or services . . . by a person in the regular course of his trade or commerce, which may, tends to or does deceive or mislead any person and includes:  . . . failure to deliver the quality or quantity of goods or services contracted for[.]

§ 57-12-2(D)(17) (emphasis added).  In order for a failure to deliver the quality or quantity of goods or services contracted for to fall within the scope of the UPA, that failure must be the result of a false or misleading statement knowingly made by the individual or entity charged with violating the UPA.  *See Diversey Corp. v. Chem-Source Corp.*, 1998-NMCA-112, ¶ 18, 125 N.M. 748, 965 P.2d 332 (noting that a requirement of a UPA violation is that a "knowing misrepresentation be made in conjunction with a failure to deliver the goods promised").  Thus, in order for us to determine that summary judgment on Eisert's UPA claim was improper, Eisert must demonstrate that the cemetery knowingly made a misrepresentation of fact in connection with its sale of the three contiguous burial plots.

**{27}**   Eisert does not point to any evidence that would suggest that the cemetery knowingly made a misrepresentation of fact when it sold the burial plots to Juan and Sofie, nor does Eisert even allege that the cemetery knowingly made such a misrepresentation.  Instead, Eisert simply states that because three burial plots were purchased, the cemetery violated the UPA by only providing two.  This allegation alone is insufficient to meet the UPA's

---

[2]Although there is some question whether Eisert has standing to bring a UPA claim for the cemetery's failure to provide Sofie with the plot she had reserved because Sofie and Eisert are unrelated, Eisert has alleged that Juan, not Sofie, paid for Sofie's plot.  Thus, we address the merits of Eisert's UPA claim.

requirement that there be a knowing misrepresentation. The undisputed facts indicate that Sofie purchased the third burial plot sometime around 1996 but that the cemetery did not discover the unknown body in Sofie's plot until Juan's burial plot was being prepared in 2002, six years after Sofie had purchased her burial plot. Thus, at the time that Sofie contracted to purchase the third burial plot, the cemetery did not know that another body already occupied the plot and could not have knowingly misrepresented that the plot was available.

**{28}** Eisert's complaint also alleges that the cemetery violated the UPA by "[f]alsely advertising and representing the burial plot of Juan Castillo to be a single burial plot, [and] then after his death burying another body [on] top of his remains." As we have already explained, Eisert has offered no evidence that the cemetery knew that Juan would be buried in a double-depth burial plot at the time that Juan contracted to reserve his burial plot. Thus, even viewing the record in the light most favorable to the party opposing summary judgment and assuming that the cemetery actually advertised Juan's burial plot as a single plot, the cemetery did not violate the UPA because it did not knowingly make a misrepresentation of fact. At the time Juan purchased his burial plot, the cemetery had no way to predict that Juan's second wife would outlive him, that her burial plot would be unavailable, and that she, as the only person with the legal authority to determine the disposition of his remains, would decide to use the plot for a double-depth burial so that she and her husband of thirty years could be buried together as they both desired. We therefore affirm the district court's grant of summary judgment with respect to Eisert's UPA claims.

### 4.     Private Right of Action

**{29}** Eisert finally argues that we should recognize a private right of action in Section 30-12-12, a criminal statute making it a fourth degree felony to disturb a burial ground. Whether a private right of action can be implied from a statute is a question of law that we review de novo. *See Hovet v. Allstate Ins. Co.*, 2004-NMSC-010, ¶ 10, 135 N.M. 397, 89 P.3d 69. Section 30-12-12 provides that "[d]isturbing a marked burial ground consists of knowingly and willfully disturbing or removing the remains, or any part of them, or any funerary object, material object or associated artifact of any person interred in any . . . cemetery or marked burial ground." The statute provides a punishment by a "fine not to exceed five thousand dollars ($5,000) or by imprisonment for a definite term of eighteen months or both." *Id.* Because there is no express language in the statute creating a private right of action, we conclude that the Legislature did not intend to create such a right of action. *See Patterson v. Globe Am. Cas. Co.*, 101 N.M. 541, 543, 685 P.2d 396, 398 (Ct. App. 1984) (holding that the absence of an express private right of action provision indicates the legislature's intent to not create such an action), *superseded by statute on other grounds as stated in Journal Publ'g Co. v. Am. Home Assur. Co.*, 771 F. Supp. 632 (S.D.N.Y. 1991).

**{30}** To overcome the lack of express language granting a private right of action, Eisert argues that we should "extend the criminal protection afforded grave sites to civil liability for the same reasons" that guided this Court's decision in *Salazar v. St. Vincent Hospital,* 95

10

N.M. 150, 154, 619 P.2d 826, 830 (Ct. App. 1980), to allow a wrongful death action for the death of a fetus. In *Salazar*, we considered whether the wrongful death act provided a civil remedy for the death of a viable fetus. We determined that because it was unlawful to cause an injury to an unborn child resulting in the fetus's death in 1882 when the wrongful death act was enacted, the Legislature must have intended to allow recovery for the wrongful death of a fetus. *Id.* at 155, 619 P.2d at 831. Thus, *Salazar* simply engaged in statutory interpretation to determine what types of deaths our Legislature intended to fall within the scope of the wrongful death act. It did not, as Eisert attempts to argue, recognize a private right of action arising directly from the criminal code. Eisert asks us, without any argument other than her citation to *Salazar*, to create a new private right of action that has not been contemplated by our Legislature. We decline to do so.

**{31}** Contrary to the wishes of both Sofie and Juan to be buried together, Eisert's complaint sought to have Sofie's body disinterred from the burial plot in which she currently rests with her husband of thirty years and moved to a location in another area of the cemetery. In the words of our Supreme Court, "we decline to enter an order which would unseal the tomb of th[ese] sleeping bod[ies]. Let [them] sleep on wholly oblivious to the turmoil that rages above [them]. *Requiescat in pace*!" *Theodore v. Theodore,* 57 N.M. 434, 439, 259 P.2d 795, 798 (1953).

## III.    CONCLUSION

**{32}** For the foregoing reasons, we affirm summary judgment in favor of the cemetery.

**{33}    IT IS SO ORDERED.**

---
**CYNTHIA A. FRY, Chief Judge**

**WE CONCUR:**

---
**CELIA FOY CASTILLO, Judge**

---
**RODERICK T. KENNEDY, Judge**

**Topic Index for *Eisert v. Archdiocese of Santa Fe*, No. 27,728**

| | |
|---|---|
| **CM** | **COMMERCIAL LAW** |
| CM-UP | Unfair Practices Act |
| | |
| **CN** | **CONTRACTS** |
| CN-BR | Breach |

CN-TB            Third Party Beneficiary

**CP**            **CIVIL PROCEDURE**
CP-SD            Standing