**Certiorari Granted, December 6, 2012, No. 33,874**

### IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number:   2013-NMCA-003**

**Filing Date: September 20, 2012**

**Docket No. 30,106**

**JOE ROBERT ENCINIAS,**

   **Plaintiff-Appellant,**

**v.**

**WHITENER LAW FIRM, P.A.**
**and RUSSELL WHITENER,**

   **Defendants-Appellees.**

**APPEAL FROM THE DISTRICT COURT OF SAN MIGUEL COUNTY**
**Eugenio S. Mathis, District Judge**

Will Ferguson & Associates
Roger V. Eaton
David M. Houliston
Albuquerque, NM

Sanders & Westbrook, P.C.
Maureen A. Sanders
Albuquerque, NM

for Appellant

Tax, Estate & Business Law, Ltd.
James T. Reist
Barry D. Williams
Albuquerque, NM

for Appellees

### OPINION

**KENNEDY, Judge.**

**{1}**     In 2006, the parents of Plaintiff Joe Robert Encinias met personally with Defendants Whitener Law Firm, P.A. and Russell Whitener (collectively, Whitener) to pursue a lawsuit against Encinias's school district for a brutal beating that Encinias suffered at the hands of two students during school hours.  There is no dispute that Whitener took on the case and failed to file the case within the statute of limitations.  When Encinias inquired about the status of the case, Whitener scurried to mend the situation by improperly filing the case with the district court in order to show Encinias that it "would do what [it] could."  Whitener voluntarily dismissed the lawsuit in the face of sanctions.  When sued for malpractice, misrepresentation, and violating the Unfair Practices Act (UPA), NMSA 1978, §§ 57-12-1 to -26 (1967, as amended through 2009), Whitener ran for the cover of our malpractice case law that holds that a case for legal malpractice cannot lie where the underlying action would not be viable. *See Richardson v. Glass*, 114 N.M. 119, 122, 835 P.2d 835, 838 (1992).  The district court granted summary judgment on all three causes of action against Whitener.

**{2}**     The liability of a school for a student's injuries under the New Mexico Tort Claims Act (TCA), NMSA 1978, §§ 41-4-1 to -30 (1976, as amended through 2010), has not been the most clearly delineated of legal principles, and it is that very pool of murky law into which we must dive to assess whether Encinias had a claim that could have succeeded against the school district.  Thus, this case is as much about the TCA's application to schools, as it is about Whitener in handling Encinias's case.  As we explain further below, we hold that the seemingly broad rule about school immunity stated in *Upton v. Clovis Mun. School Dist.*, 2006-NMSC-040, 140 N.M. 205, 141 P. 3d 1259, does not extend so far as to provide relief to Encinias in this case.   We also determine that his claims for misrepresentation and unfair trade practices must fail as well.  We affirm the district court's orders granting summary judgment to Whitener on all claims.

## I.     BACKGROUND

**{3}**     In September 2004, Encinias was attacked during the lunch period at his high school in Las Vegas, New Mexico, by one or two fellow students.  The attack occurred on a street adjacent to the school that was roped off by the school for lunch vendors to provide food to the students.  As a result of the attack, Encinias suffered serious injuries that required him to be airlifted to Albuquerque for medical treatment.  No school faculty or security was monitoring that area at the time of the attack.  It is disputed whether, pursuant to a school safety policy, a member of the school personnel was supposed to be watching the area where the attack occurred during the lunch period.

**{4}**     In January 2006, Encinias contacted Whitener to represent him in a suit against the high school after seeing advertisements on television and in a phone book for the firm.  Whitener agreed to represent Encinias, but then failed to bring suit within the statute of limitations.  Encinias contends that Whitener "engaged in a series of misrepresentations about the case's merits, its status, and the missed statute of limitations for filing the case."

2

Subsequently, Encinias sued under several causes of action, three of which are before us today—malpractice, violations of the UPA, and misrepresentation. Whitener moved for summary judgment on each claim. The district court granted summary judgment on all claims. Encinias now appeals from orders granting summary judgment on the UPA claim, the misrepresentation claim, and the underlying case.

## II.    STANDARD OF REVIEW

{5}    "We are mindful that summary judgment is a drastic remedial tool which demands the exercise of caution in its application, and we review the record in the light most favorable to support a trial on the merits." *Woodhull v. Meinel*, 2009-NMCA-015, ¶ 7, 145 N.M. 533, 202 P.3d 126 (internal quotation marks and citation omitted). "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. "We review these legal questions de novo." *Id.* "We also review the applicability of the TCA de novo." *Upton*, 2006-NMSC-040, ¶ 7.

{6}    We consider an issue of fact to be genuine "if the evidence before the court considering a motion for summary judgment would allow a hypothetical fair-minded fact[]finder to return a verdict favorable to the non-movant on that particular issue of fact." *Romero v. Philip Morris, Inc.*, 2009-NMCA-022, ¶ 12, 145 N.M. 658, 203 P.3d 873, *rev'd on other grounds*, 2010-NMSC-035, 148 N.M. 713, 242 P.3d 280. We consider an issue of fact to be "material if the existence (or non-existence) of the fact is of consequence under the substantive rules of law governing the parties' dispute." 2009-NMCA-022, ¶ 12 (internal quotation marks omitted). "[T]he party opposing summary judgment has the burden to show at least a reasonable doubt, rather than a slight doubt, as to the existence of a genuine issue of fact." *Eisert v. Archdiocese of Santa Fe*, 2009-NMCA-042, ¶ 10, 146 N.M. 179, 207 P.3d 1156 (internal quotation marks and citation omitted).

## III.    DISCUSSION

### A.    The School Did Not Waive Its Immunity Under the TCA

{7}    The district court granted Whitener's motion for summary judgment, holding that Encinias's malpractice claim must fail because the underlying claim was barred by the school's immunity from suit. *See Richardson*, 114 N.M. at 122, 835 P.2d at 838 ("[The p]laintiff ha[s] the burden of not only proving her counsel's negligence, but also that she would have recovered at trial in the underlying action."). The district court concluded that "while . . . parents rely on school officials to protect their children, and schools develop policies in an attempt to achieve this end, schools like other governmental agencies do not have a duty to do everything that might or could have been done." *See Cobos v. Doña Ana Cnty. Hous. Auth.*, 1998-NMSC-049, ¶ 6, 126 N.M. 418, 970 P.2d 1143 (quoting the legislative purpose of the TCA that "government should not have the duty to do everything that might be done"); § 41-4-2(A). Thus, the first issue before us is whether the claim

3

Encinias sought to bring against the school was barred as a matter of law by immunity under the TCA, thereby foreclosing Encinias's claim for malpractice.

**{8}** The State is generally granted immunity from suit, but the TCA waives that immunity in "certain defined circumstances." *Cobos*, 1998-NMSC-049, ¶ 6. "Generally, the [TCA] provides governmental entities and public employees acting in their official capacities with immunity from tort suits unless the Act sets out a specific waiver of that immunity." *Wachocki v. Bernalillo Cnty. Sheriff's Dep't*, 2010-NMCA-021, ¶ 18, 147 N.M. 720, 228 P.3d 504 (internal quotation marks and citation omitted), *aff'd*, 2011-NMSC-039, 150 N.M. 650, 265 P.3d 701; *see* § 41-4-4(A) (providing that, with few statutory exceptions, "[a] governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort"). Section 41-4-6(A) is one such waiver, and it provides that the "immunity granted pursuant to Subsection A of Section 41-4-4 . . . does not apply to liability for damages resulting from bodily injury . . . caused by the negligence of public employees while acting within the scope of their duties in the *operation or maintenance of any building*[.]" (Emphasis added.) The central question is whether the negligent operation or maintenance of a building creates a "dangerous condition that threatens the general public or a class of users of the building." *Upton*, 2006-NMSC-040, ¶ 8. Contrary to Encinias's arguments, *Upton* is distinguishable from this case and does not compel us to conclude that the school is subject to the limited waiver of immunity to be liable for his injuries.

**{9}** Encinias argues that he "had a claim that on the day he was beaten, school personnel were negligent while they were acting within the scope of their duties in the operation or maintenance of the school [and thus,] the school district did not have a defense of immunity to the claims." More specifically, Encinias argues that the school's negligent execution of its safety policies for patrolling the campus during the lunch period, and the school's failure to keep a suspended student off campus, resulted in his injuries. Evidence proffered below indicates that it may have been the responsibility of a security guard or faculty member to patrol the food vendor area and that no one patrolled that area at the time of the attack. Encinias contends that he was first hit by fellow student and friend, Michael Salazar, and then by a second assailant, Chris Chavez, who had been suspended from school on the morning of the attack, but entered the campus area for no apparent reason but to attack Encinias. Salazar attested in his affidavit that a security guard or teacher usually patrolled the food vendor area, but neither was present at the time of the attack. In an affidavit, the assistant principal stated that the location of the attack near the food vendors was a known "[h]ot zone" for student violence and that a security guard was supposed to patrol that area during the lunch period.

**{10}** Encinias relies in part upon *Upton* to argue that the school's immunity was waived by its negligence. *See id.* ¶ 9. In *Upton*, a student had been allowed to limit her participation in a mandatory physical education class owing to her asthma. *Id.* ¶ 2. Her condition was also noted in an "Individualized Education Plan . . . , an agreement between parents of children with special needs and educators specifying certain educational goals and the

4

special services their child would require." *Id.* Subsequently, a substitute teacher, who was not informed of the waiver, required the student to engage in strenuous exercise during gym class and would not let her take a break from it when she became uncomfortable. *Id.* ¶¶ 3, 10. When the student suffered an asthma attack as a result of the exercise, the school responded slowly and inappropriately to the situation, resulting in the student's death. *Id.* ¶¶ 4-5. The New Mexico Supreme Court concluded that the school was not immune from suit under the TCA because it was negligent in administering its safety procedures in operation of the school building. *Id.* ¶ 25. The Supreme Court explained that "[j]ust as schools generally have safety procedures in place for various kinds of emergencies, a school simply cannot operate in a safe, reasonable, and prudent manner without affording, at the very least, the health and safety services that students have been promised, and upon which parents have relied." *Id.* ¶ 13. Encinias contends that, in this case, the school's negligent failure to follow its own safety procedures endangered all of the students in the food vendor area and resulted in his injury, thus waiving the school's immunity from suit under the TCA. We disagree with Encinias and conclude that *Upton* represents a different set of circumstances that falls outside one of the exceptions that would waive immunity under the TCA. *See id.* ¶ 9.

**{11}** Whitener asserts that Encinias's underlying claim against the school differs from *Upton* because his claim is fundamentally about negligent supervision "that [the school] failed to have security guards or other personnel physically in place at the precise time and location of the assault[.]" Case law has established that "it is not enough to show that public employees negligently supervised persons in their care and that the resulting injury occurred on public property." *Leithead v. City of Santa Fe*, 1997-NMCA-041, ¶ 7, 123 N.M. 353, 940 P.2d 459. In *Pemberton v. Cordova*, a student struck and injured another student on campus. 105 N.M. 476, 477, 734 P.2d 254, 255 (Ct. App. 1987). The injured student sued the school, arguing the school waived its TCA immunity under the Section 41-4-6(A) building waiver. *Id.* at 477-78, 734 P.2d at 255-56. On appeal, this Court concluded that, under the TCA, a school could not waive its immunity under a theory of negligent supervision because negligent supervision was not a specified exception to the general grant of immunity, so as to establish a waiver under the TCA. *Id.* at 478, 734 P.2d at 256.

**{12}** The Supreme Court reiterated this principle in *Espinoza v. Town of Taos*, where a child was injured on a public playground after falling from a slide while participating in a city-sponsored day camp. 120 N.M. 680, 681-82, 905 P.2d 718, 719-20 (1995). The Supreme Court concluded that the city's immunity had not been waived under Section 41-4-6 because the child's parents solely argued that the city camp negligently supervised their child. *Id.* at 682-83, 905 P.2d at 720-21. The Supreme Court concluded that the playground slide was not a condition of the premises that would be dangerous without supervision. *Id.* at 682-84, 905 P.2d at 720-22.

**{13}** We agree with Whitener that Encinias's claim, although couched in terms of a failure to follow a safety policy, is solely a claim for negligent supervision. The school's procedures would have done no more than require the presence of a teacher or security guard

5

in a specific area to watch students. The only negligence alleged is the failure to supervise. Encinias cites to *Upton*, which offers guidance in making this distinction. In *Upton*, the Supreme Court restated the principle that immunity cannot be waived by negligent supervision alone. 2006-NMSC-040, ¶ 16. The Court explained that for the plaintiff to succeed in waiving immunity under a theory of negligent supervision, the negligent supervision must be directly tied to the operation and maintenance of the building. *Id.* As an example, the Court analyzed *Espinoza*, concluding that "[t]he key point in [that case] is that the negligence must be of a kind which makes the premises dangerous, or potentially so, to the affected public, the consumers of the service[,] or the users of the building" to waive immunity. *Upton*, 2006-NMSC-040, ¶ 23. The *Upton* Court explained that, "[i]f the only alleged misconduct toward [the student] had been the substitute . . . teacher failing to watch her while she participated in physical exercise, . . . Upton's claim would be . . . practically identical to the single claim of negligent supervision we found inadequate in *Espinoza*." *Upton*, 2006-NMSC-040, ¶ 21.

**{14}** In the case before us, the alleged negligence is based upon the failure of a security guard or faculty member to monitor an area of the school. The negligence in *Upton* was far broader and greater than what is present here. In *Upton*, the school's failure to appropriately respond to an existing medical emergency generally "created a dangerous condition . . . for every student at the school[,]" and the school's subsequent indifference to the child's special needs when unable to breathe made it likely that all similarly situated students were at risk as well. *Id.* ¶ 24. In the present case, no evidence was presented to show that the failure to monitor the vendor area created a dangerous condition to the students in that area.

**{15}** We note that this same principle—that the negligence must make the premises dangerous—has been applied in the other cases that Encinias relies on to argue that the school's negligence was the type that would result in waiver of immunity. *See Williams v. Cent. Consol. Sch. Dist.*, 1998-NMCA-006, ¶ 17, 124 N.M. 488, 952 P.2d 978 (holding that the school district's immunity was waived because of the negligence of its own employees in failing to deal with a design defect in the windows of the school building); *Leithead*, 1997-NMCA-041, ¶¶ 15-16 (waiving immunity where the lifeguard's negligence made the pool dangerous and resulted in the drowning of a child because lifeguard supervision was essential to the nature of a safe public pool); *see also Bober v. N.M. State Fair*, 111 N.M. 644, 652-53, 808 P.2d 614, 622-23 (1991) (holding that the State Fair was not immune from liability under the TCA when the location of entrances and traffic flow into the State Fair created unsafe conditions for motorists); *Castillo v. Santa Fe Cnty.*, 107 N.M. 204, 206-07, 755 P.2d 48, 50-51 (1988) (waiving the county's immunity with regard to a county-owned and operated public housing project when a loose dog bit an invitee and remanding for factual development regarding whether the county knew of dogs running loose within the project, which posed an obvious danger to all residents and visitors).

**{16}** In this case, Encinias alleges that a security guard or teacher failed to patrol the area in accordance with stated policies and procedures. This failure does not consequently make the premises dangerous or potentially dangerous to the affected public. Although we could

6

imagine a situation where an area on campus was so inherently dangerous as to require supervision to make the area safe, Encinias failed to provide any evidence that this was the case. No other duties for active supervision to implement policies against fighting in this context are shown, nor is the failure of any policy to actively exclude a suspended student from the premises after he is sent home. The school's immunity is a threshold legal determination as to whether there was building waiver. *See Cobos*, 1998-NMSC-049, ¶ 5; *Williams*, 1998-NMCA-006, ¶ 8. In response to Whitener's motion for summary judgment, Encinias had the burden of producing sufficient evidence to support a determination that the building waiver applied; i.e., that some condition of the property made the area so inherently dangerous that supervision was necessary to make it safe. *See Dow v. Chilili Coop. Ass'n*, 105 N.M. 52, 54-55, 728 P.2d 462, 464-65 (1986) (explaining that a party opposing summary judgment may not simply argue that evidentiary facts requiring a trial on the merits may exist).

**{17}** Here, Encinias relies entirely on a statement from a former assistant principal that the area was "considered to be a 'hot zone' for potential trouble around the school" to support the dangerous condition aspect of his building waiver argument. In her affidavit, the former assistant principal stated that "[h]ot zones were locations where students congregate and where there has been a history of problems that exist such as fights." No other evidence supported Encinias's contention that the area was inherently dangerous. Not only does the former assistant principal's statement amount to a legal conclusion that a dangerous condition existed, but it is insufficient to support a conclusion that supervision was necessary. We know nothing about the frequency of student violence in the area, or why the violence would occur in this area, so as to require supervision to make it safe. Even viewing the evidence in the light most favorable to Encinias, a mere statement that the area was a "hot zone for trouble," without more, is insufficient to support a conclusion that a condition existed on the premises, so as to require supervision to make it safe.

**{18}** Thus, supervision alone will not be enough to waive immunity. To the extent that Encinias argues that safety policies were not followed to prevent a suspended student from accessing a street adjacent to an open campus where food trucks were parked at lunch and students could come and go at will, we conclude that this also amounts to negligent supervision. The negligent act at issue with regard to the suspended student rests entirely on the security guard's or faculty member's absence in supervising the area where the attack occurred.

**{19}** Furthermore, to the extent that the Dissent relies on aspirational goals, specifically the "benchmarks" stated in the school's report card as establishing safety policies, such goals are irrelevant. Encinias sought to prove that the school failed to follow the specific policy of having personnel patrol the lunch truck area and that such a failure waived immunity. Even assuming it was a safety policy and that the school failed to implement the policy, Encinias failed to show that supervision was necessary to keep the area safe. As stated above, failure to patrol amounts to inadequate supervision, which, alone, is insufficient to waive immunity.

7

**{20}** In addition, the Dissent fails to explain why "the case now before us should stand or fall as a negligent operation or maintenance case, not a negligent supervision case." Dissent ¶ 40. The Dissent cites generally to *Callaway v. New Mexico Dep't. of Corr.*, 117 N.M. 637, 875 P.2d 393 (Ct. App. 1994), and *Castillo v. Cnty. of Santa Fe*, 107 N.M. 204, 755 P.2d 48 (1988) for support. These cases are plainly distinguishable to the case at bar.

**{21}** In *Callaway*, the plaintiff prisoner was attacked by three inmates, who were known and dangerous gang members, who had been allowed inside a recreational room of the prison, which had potential weapons, blind spots, and only two prison guards. This Court explained:

> The structural design and layout of the recreation room added to the danger of the situation in that the room [had] blind corners, a stair well, and other areas which [were] shielded from direct observation by the recreation officers. In addition, potential weapons such as weight bars and pool cues [were] located in the recreation area.

117 N.M. at 639, 875 P.2d at 395. We concluded that "[the d]efendants knew or should have known that roaming gang members with a known propensity for violence had access to potential weapons in the recreation area, that such gang members created a dangerous condition on the premises of the penitentiary, and that the danger to other inmates was foreseeable." *Id*. at 643, 875 P.2d at 399.

**{22}** In contrast to the case at bar, the evidence in *Callaway* clearly supported a conclusion that an inherently dangerous condition existed. In operating the prison, the defendants corralled convicted felons, who were also known gang members, in a room where they had the means and opportunity to assault fellow prisoners. *Callaway* dealt with more than mere supervision because the operation of the prison necessarily involved the containment and restraint of potentially dangerous persons and their access to weapons and new inmates. Nonetheless, to the extent that it could be construed as a supervision case, supervision was obviously necessary to make the recreation room safe under these circumstances. No such facts in the present case allow us to reach a similar conclusion that there is a dangerous condition requiring supervision within the food truck area.

**{23}** Furthermore, *Castillo*, which is not a supervision case, presents facts that demonstrate the existence of a known dangerous condition. In *Castillo*, a three-year-old child was severely bitten by a dog roaming loose on the grounds of the county's public housing project. 107 N.M. at 205, 755 P.2d at 49. Under the more deferential standard of a motion to dismiss, our Supreme Court concluded that allegations that the defendant had knowledge of "the unsafe condition represented by dogs running loose within the project" was sufficient to state a claim for waiver of immunity. *Id*. at 207, 755 P.2d at 51. Unlike *Castillo*, the case at bar comes before us on a motion for summary judgment and, thus, Encinias had the burden to produce evidence sufficient to prove waiver. Mere allegations and legal conclusions are insufficient. In addition, the facts provided in *Castillo* demonstrate

8

a dangerous condition that the defendant knew about and had a duty to address. The negligent act alleged in *Castillo* is much more than the mere supervision we address in the present case.

{24}    Therefore, we conclude that the school did not waive its immunity under the TCA because Encinias solely alleged negligent supervision and failed to provide sufficient evidence of a dangerous condition requiring supervision. The district court did not err in granting summary judgment on this claim.

**B.      Encinias Failed to Make a Prima Facie Case for a Claim Under the UPA**

{25}    Encinias appeals the district court's order granting summary judgment with regard to his UPA claim. At trial, the district court found that the UPA did not apply to attorneys, and "there [wa]s no genuine issue of material fact that the advertising at issue was false and misleading under the [UPA,] and [Encinias] has failed to establish a prima facie claim." Assuming, without deciding, that the UPA applies to attorneys and their advertising, we conclude that the district court properly granted summary judgment on Encinias's UPA claim against Whitener.

> In order to state a claim under the UPA, a complaint must contain allegations to the effect that[] (1) the defendant made an oral or written statement, a visual description or a representation of any kind that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business; and (3) the representation was of the type that may, tends to, or does deceive or mislead any person.

*Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶ 5, 142 N.M. 437, 166 P.3d 1091. "The subjective belief of the party receiving the information is not sufficient to establish a violation of the Act." *Eckhardt v. Charter Hosp. of Albuquerque, Inc.*, 1998-NMCA-017, ¶ 60, 124 N.M. 549, 953 P.2d 722.

{26}    At trial, Encinias based his UPA claim upon allegedly misleading advertisements about the firm's abilities made on a magnet in a phone book and in a television commercial by Whitener. To the extent Encinias argues on appeal that acts other than the advertisements constitute a violation of the UPA, or that he interpreted the advertisements to indicate that Russell Whitener was going to personally represent him, we will not address these arguments, as they were not made below. *Builders Contract Interiors, Inc. v. Hi-Lo Indus., Inc.*, 2006-NMCA-053, ¶ 5, 139 N.M. 508, 134 P.3d 795 (declining to address an argument made for the first time on appeal).

{27}    In this case, the television commercial at issue featured Russell Whitener saying—"don't accept a quick check until you check with me"—and mentioned car accidents. The phone book magnet basically had the same language printed on it and listed

the firm's areas of practice as "serious injuries[,] auto accidents[, and] wrongful death." (Emphasis omitted.)  At the hearing on the motion for summary judgment, Encinias argued that these advertisements were misleading because Russell Whitener said that the "Whitener [Law Firm] would act as attorneys, [but] they didn't."  Encinias repeatedly argued that the misleading aspect of the advertisements rested entirely on Whitener's failure to act as attorneys in accordance with what was asserted in the advertising.  In response, the court pointed out that Encinias's whole argument about Whitener's failure to act as attorneys rested on a missed deadline.  The court subsequently indicated that it did not find the advertisements misleading or false and that Encinias failed to establish a prima facie case for his UPA claim.

**{28}**  We likewise reason that no hypothetical fair-minded fact finder would find these advertisements misleading or false.  *Romero*, 2009-NMCA-022, ¶ 12 ("An issue of fact is genuine if the evidence before the court considering a motion for summary judgment would allow a hypothetical fair-minded fact[]finder to return a verdict favorable to the non-movant on that particular issue of fact."  (internal quotation marks and citation omitted)).  The advertisements simply indicate Whitener's area of practice—personal injury lawsuits—which appears to be accurate.  The advertisements do not deceive the audience with guarantees or promises.  Although failing to file a case within the applicable statute of limitations falls below the standard of practice generally expected of attorneys, we conclude that no genuine disputed material fact existed as to whether the advertisements were misleading or false.  *See In re Reid*, 116 N.M. 38, 39-40, 859 P.2d 1065, 1066-67 (1993) (per curiam) (determining that there was professional misconduct where an attorney delayed three years before filing a lawsuit, failed to keep the client reasonably informed of the true status of the matter, and failed to investigate factual and legal basis of the client's case).  Because Encinias could not establish the first requirement of his UPA claim, summary judgment was properly granted.

## C.    Misrepresentation Claim

**{29}**  Lastly, Encinias argues that the district court also improperly granted summary judgment of his claim for misrepresentation.  In addition to renewing his argument with regard to the advertisement in the form of a misrepresentation claim, Encinias contends that Whitener made misrepresentations by (1) failing to disclose information about the status of the case against the school district, (2) misrepresenting the statute of limitations, and (3) concealing Whitener's failure to file the case within the statute of limitations.  Although from the exhibits in the record it appears that Whitener withheld information from Encinias and that such behavior could be found negligent, we nonetheless conclude that the district court properly granted summary judgment because Encinias failed to establish that he was damaged by these acts.

**{30}**  Both negligent and intentional fraudulent misrepresentation require that Encinias suffer damages as a result of the misrepresentation.  *See* UJI 13-1632 NMRA; UJI 13-1633 NMRA; UJI 13-1631 NMRA; *Williams v. Stewart*, 2005-NMCA-061, ¶ 34, 137 N.M. 420,

112 P.3d 281 ("[A] plaintiff alleging fraud may recover such damages as are the direct and natural consequences of the reliance on a fraudulent representation." (internal quotation marks and citation omitted)); *Charter Servs., Inc. v. Principal Mut. Life Ins. Co.*, 117 N.M. 82, 86, 868 P.2d 1307, 1311 (Ct. App. 1994) ("Damages for negligent misrepresentation are those proximately caused by the misrepresentation."). In his brief, complaint, and memorandum in opposition to Whitener's motion for summary judgment on the misrepresentation claim, Encinias makes it clear that the only damages he incurred from the misrepresentation resulted from his inability to change his representation in order to file his case against the school district in a timely manner. Encinias did not argue nominal or punitive damages on appeal or below. Since Encinias cannot succeed on his underlying claim because of the school district's immunity under the TCA, he was not damaged by Whitener's misrepresentations, and the district court properly dismissed Encinias's misrepresentation claim.

## IV. CONCLUSION

{31} For the reasons stated above, we conclude the district court did not err in granting summary judgment to Whitener, and we affirm its judgment.

{32} **IT IS SO ORDERED.**

_____
**RODERICK T. KENNEDY, Judge**

**I CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

**JONATHAN B. SUTIN, Judge (dissenting).**

**SUTIN, Judge (dissenting).**

{33} I respectfully dissent.

{34} The Majority Opinion acknowledges that "[t]he central question is whether the negligent operation or maintenance of a building creates a 'dangerous condition that threatens the general public or a class of users of the building.'" Majority Opinion, ¶ 8. The Opinion cites and discusses *Upton*, 2006-NMSC-040, as though *Upton* is the case on which Encinias places his main reliance. Majority Opinion, ¶¶ 2, 8, 10-11, 13-14. The Opinion holds "that the seemingly broad rule about school immunity stated in *Upton* . . . does not extend so far as to provide relief to Encinias in this case." Majority Opinion, ¶ 2. Yet the Opinion acknowledges that "[e]vidence proffered below indicates that it may have been the responsibility of a security guard or faculty member to patrol the food vendor area and that

11

no one patrolled that area at the time of the attack." *Id.* ¶ 9. The Opinion acknowledges that "[i]n an affidavit, the assistant principal stated that the location of the attack near the food vendors was a known 'hot zone' for student violence and that a security guard was supposed to patrol that area during the lunch period[,]" and further that "'hot zones were locations where students congregate and where there has been a history of problems that exist such as fights.'" *Id.* ¶¶ 9, 17 (alterations omitted). The Opinion acknowledges that, in another affidavit, an affiant stated that "a security guard or teacher usually patrolled the food vendor area, but neither was present at the time of the attack." *Id.* ¶ 9. The Opinion acknowledges that Encinias's claim is "couched in terms of a failure to follow a safety policy[.]" *Id.* ¶ 13. And the Opinion acknowledges that "Encinias alleges that a security guard or teacher failed to patrol the area in accordance with stated policies and procedures." *Id.* ¶ 16.

**{35}** The Majority Opinion appears to acknowledge the existence of the school's printed "report card[.]" Majority Opinion, ¶ 19. The report card states, "[e]ach year, every New Mexico school district is required to collect and report to its community a variety of information about the district and its schools" and also states that "[t]his report card includes data for the five required statewide indicators[,]" listing "School Safety" as one of the five indicators. The report card explains that "[t]o demonstrate school safety, schools are asked to report" such matters as:

- an accepted school-level safety plan;
  . . .
- a plan for staff development in the area of school safety;
- identified goals and benchmarks for progress toward school safety";

and, under "Benchmarks," that

2. Local school district plans for safe schools will be developed and implemented to assure the safety of all students and staff at school.
   . . . .
5. School staff will not tolerate harassment of anyone in any form at school. . . .
   . . . .
10. School district will ensure that school buildings and grounds are designed or adapted to promote security.

And, last, the report card states:

The safety of students and staff is a primary concern of the current [school] administration. We have implemented a program to review and address all of our policies and procedures in our school safety handbook. A district consortium of school personnel, law enforcement, and fire department officials has been assembled to review all aspects of school safety at all the school sites including [Robertson High School]. As part of that program, we

12

are conducting extensive drills to insure the safety of all staff and students in our care. Additionally, the [school] campus has been undergoing extensive remodeling to its building to ensure the safety codes outlined by state and local authorities are being met.

Concerning the Number of Police Reported Incidents, the administration believes that our numbers are well below [s]tate averages. However, we also believe that any criminal activity on school grounds is unacceptable. We have initiated a number of procedures to help reduce criminal activity at [the school] including the following: we have brought drug dogs to search the entire campus; we have two security guards to patrol our campus daily; we have a mediation program consisting of school counselors to conduct mediations whenever there is a conflict with [the school's] students; and we have placed security cameras throughout the campus to better enable the policing of our campus.

We take the safety of all of [the] students and staff very seriously at [the school,] and we are implementing policies and programs to ensure everyone's safety.

This report card document evidences a definite safety policy with respect to safety of students and implementation of the policy, as well as implementation of programs to ensure safety.

**{36}** The affidavit of a security guard at the school stated that, of two guards, one "would be at an area where the students congregated for the lunch period." "One of the specific areas" mentioned in this affidavit is the location in question, namely, "the location of the vendor trucks on [Fifth] Street in front of the Administration Building." This affidavit at the very least raises a reasonable inference that a guard was to be stationed at the area where Encinias was attacked, pursuant to the policies and programs of the school to ensure the security and safety of students.

**{37}** The assistant principal's affidavit stated that "[t]he area where the vendor trucks parked was considered to be a 'hot zone' for potential trouble around the school." She stated that a security guard "was responsible for watching that area." She defined "hot zones" as "locations where students congregate and where there has been a history of problems that exist such as fights." This evidence imputes knowledge on the part of the school that the area where Encinias was attacked was an unsafe area requiring security. Further, the affidavit stated that at least a portion of the duty of the assistant principal during the lunch period was to patrol this area.

**{38}** In deposition testimony, Encinias's expert (Blauvelt) testified that it was his opinion that "[s]chool administration has a duty to protect students in the identified danger zone."

13

The witness further stated that the school had identified the vendor area as a danger zone in the school's "Emergency Procedures[.]"

**{39}** Our case law solidly holds that, in the context of Section 41-4-6, the phrase "operation or maintenance" must be interpreted broadly. *See Williams*, 1998-NMCA-006, ¶ 10 ("We . . . observe that on several occasions our Supreme Court has rejected a narrow view of 'operation or maintenance' with respect to public buildings, in favor of a broad interpretation of Section 41-4-6[.]"). Under a broad interpretation, Section 41-4-6 includes a duty "to exercise reasonable care to prevent or correct dangerous conditions on public property." *Williams*, 1998-NMCA-006, ¶ 10.

**{40}** The Majority Opinion changes from analysis of the reach of negligent operation or maintenance to the concept of negligent supervision, focusing on a view that Encinias's allegation "is solely a claim for negligent supervision." Majority Opinion, ¶¶ 11-13, 17-18. When the issue is whether the negligence is that of supervision or that of operation or maintenance, the development of the still mushy, or as the Majority characterizes it, "murky," law of immunity waiver still has a way to go. The Majority Opinion does not advance the development. It is not helpful to hold as the Majority does that the circumstances as a matter of law constitute negligent supervision by relying on fully distinguishable negligent supervision cases. Nor is it helpful to distinguish *Upton*, an operation and maintenance case far different from this case. Encinias actually places little reliance on *Upton*. It seems to me that the case now before us should stand or fall as a negligent operation or maintenance case, not a negligent supervision case.

**{41}** As indicated in the Majority Opinion, Whitener sought, and the district court granted, the cover of malpractice case law precluding malpractice relief where it is obvious that the state (here the school or school district) was immune from tort liability if it were sued in an action and therefore obvious that the underlying claim would not be viable. Majority Opinion, ¶ 1. Whether an action is viable depends on whether it states a claim of breach of a duty "to exercise reasonable care to prevent or correct dangerous conditions on public property." *Williams*, 1998-NMCA-006, ¶ 10. In this case, the evidence presented on the issue of negligent operation or maintenance of public property included the known existence of a danger zone for violence at a particular location and during a particular segment of time that students congregated. From evidence presented, a reasonable inference could be drawn that the school had implemented a safety policy by requiring a security guard to be at the danger zone and by having a faculty member patrol at the area during the danger period.

**{42}** The failure of security and safety under these circumstances could constitute the creation of a dangerous condition that threatened students congregating in the area. In my view, this comes closer to the Section 41-4-6 building and grounds immunity waiver cases than to those hinged on negligent supervision. *See Cobos*, 1998-NMSC-049, ¶ 18 (imposing, based on "the relationships of the actors[,] . . . at least limited duties of operation or maintenance"); *Bober*, 111 N.M. at 653, 808 P.2d at 623 (adopting the "broader view" articulated in *Castillo* that Section 41-4-6 contemplated immunity waiver with respect to

14

negligent injury "aris[ing] from an unsafe, dangerous, or defective condition on property" and permitting an action under that section where the State Fair failed to install traffic control devices); *Castillo*, 107 N.M. at 207, 755 P.2d at 51 (holding a waiver of immunity if the Housing Authority had knowledge "of the unsafe condition represented by dogs running loose within the project"); *Williams*, 1998-NMCA-006, ¶¶ 1-2, 17 (permitting an action under Section 41-4-6 for a school's negligence in failing to place safety glass in a window and with no protective device to shield it); *Leithead*, 1997-NMCA-041, ¶¶ 1, 12 (permitting an action under Section 41-4-6 for negligent provision of lifeguard services at a public swimming pool "even though it may also involve elements of negligent supervision of children"); *Callaway*, 117 N.M. at 643, 875 P.2d at 399 (holding that the plaintiff stated a claim under Section 41-4-6 for "allowing the known and dangerous gang members loose to victimize the general prison population").

_____
**JONATHAN B. SUTIN, Judge**

**Topic Index for *Encinias v. Whitener Law Firm, P.A.*, No. 30,106**

**APPEAL AND ERROR**
Standard of Review

**ATTORNEYS**
Legal Malpractice

**CIVIL PROCEDURE**
Limitation of Actions
Summary Judgment
Waiver

**GOVERNMENT**
Education and Schools
Sovereign Immunity

**MISCELLANEOUS STATUTES**
Unfair Practices Act

**TORTS**
Legal Malpractice
Negligence
Premises Liability
Tort Claims Act